

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-18-00131-CV

Lorraine **KENYON**, Individually and as Executrix of the Estate of Theodore Kenyon,
Appellant

v.

**ELEPHANT INSURANCE COMPANY, LLC**,
Appellee

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2016CI14055
Honorable Michael E. Mery, Judge Presiding

### OPINION ON EN BANC RECONSIDERATION

Opinion by:    Luz Elena D. Chapa, Justice
Dissenting Opinion by: Sandee Bryan Marion, Chief Justice
Dissenting Opinion by: Rebeca C. Martinez, Justice

Sitting en banc:    Sandee Bryan Marion, Chief Justice
                    Rebeca C. Martinez, Justice
                    Patricia O. Alvarez, Justice
                    Luz Elena D. Chapa, Justice
                    Irene Rios, Justice
                    Beth Watkins, Justice
                    Liza Rodriguez, Justice

Delivered and Filed: April 1, 2020

DISMISSED IN PART, REVERSED IN PART

This court previously ordered en banc reconsideration. We now withdraw our prior

opinions and judgment and substitute today's opinions and judgment in their stead.

**INTRODUCTION**

This permissive appeal arises from a wrongful death and survival action involving Theodore Kenyon, who died in the second of two successive car accidents. Lorraine Kenyon, individually and as executrix of her husband's estate, appeals a partial summary judgment on her claims against Elephant Insurance Company for misrepresentation under the Insurance Code and Texas Deceptive Trade Practice Act (DTPA), common law negligence, negligent undertaking, negligent training, and gross negligence. We dismiss in part and reverse in part.

**FACTUAL BACKGROUND**

Elephant is in the business of selling auto insurance. Elephant sells personal injury protection coverage, collision coverage, and uninsured/underinsured motorist coverage. Elephant also offers roadside assistance coverage. Under Elephant's standard auto insurance policy, an insured must report an accident or loss within 24 hours or "as soon as practicable." An insured must also fully cooperate with Elephant during its investigation of an insurance claim. Otherwise, coverage could be denied.

Although an accident or loss may be reported within a 24-hour period from time of occurrence, Elephant's insureds, including those with roadside assistance, sometimes call to report a claim from the scene of a car accident. For those who do, Elephant trains its first notice of loss (FNOL) representatives to "encourage [insureds] to take [pictures] of all vehicles involved." Elephant's FNOL representatives are aware "there may be dangerous situations or circumstances for [those] at the scene of an accident."

Elephant's FNOL representatives also encourage insureds to "get the police involved." From a first responder's perspective, an insurance company that encourages insureds to take pictures at the scene of an accident increases safety hazards; the practice exposes the insured, police officers, and other first responders to an increased risk of harm from other drivers; and, at

accident scenes, police officers have "more issues with people getting out of cars to photograph crash scenes than anything else."

Elephant encourages insureds to take pictures of the scene of the accident to determine fault and liability, but often uses for investigation purposes pictures of car damage that are taken the "day, week, or month" after an accident. In addition to obtaining pictures from its insureds, Elephant's adjusters independently obtain pictures of car damage after an accident is reported and, under the policy, its adjusters "appraise any damaged auto . . . before any repair or disposal."

Elephant has a one-page script its representatives use to collect information on FNOL calls. This script contains questions or prompts from which FNOL representatives can determine whether an insured's car is covered by the policy, the type of coverage the insured has, and whether the accident involves multiple cars or only one car. Elephant also trains its representatives to ask for pictures and information from the police "on every FNOL call, every time." The reason for encouraging insureds to take pictures at the scene of a one-car accident has been questioned because, as one police officer testified during his deposition, when the policy's coverage is "comprehensive, you know who's going to pay, you know who's at fault because you're by yourself."

The Kenyons contracted with Elephant by purchasing a policy that includes roadside assistance coverage. One day, Lorraine Kenyon was involved in a one-car accident. It was raining, the road was very wet, and Kenyon's car slid, spun, and hit a guardrail. Kenyon first called her husband Theodore, who arrived at the scene. She then called Elephant to report the accident and described the incident in detail to Katlyn Moritz, Elephant's FNOL representative who answered Kenyon's call. Moritz obtained Kenyon's policy number; noted Kenyon had roadside assistance coverage; encouraged Kenyon to call the police; and opined as to Kenyon's potential liability for damage to the guardrail.

Moritz also instructed Kenyon, "Go ahead and take pictures." Kenyon then told Theodore to take pictures. While Theodore was taking pictures, another car, in the same manner as Kenyon's car, slid off the road and struck him. Theodore died as a result of the injuries he sustained from the collision. After the accident, and at an off-accident-site location, Elephant obtained pictures of the damage to Kenyon's car in order to process Kenyon's insurance claim. Elephant, however, insisted that Kenyon first waive all of her and Theodore's causes of action before processing her uninsured/underinsured motorist claim.

### PROCEDURAL BACKGROUND

Kenyon filed a wrongful death and survival action in district court. In addition to suing the driver who struck Theodore for negligence, Kenyon sued Elephant. Kenyon alleged claims against Elephant based on several different negligence theories, misrepresentation under the Insurance Code and DTPA, and failure to timely settle and pay her uninsured/underinsured motorist claim.

Elephant moved for summary judgment, presenting various traditional and no-evidence grounds. The trial court rendered summary judgment on all claims except Kenyon's untimely settlement claim. The order specified the sole basis for rendering partial summary judgment was Elephant "owed no duty" to the Kenyons.

The trial court granted Kenyon permission to appeal the order. The permission was limited to the negligence claims. Kenyon filed a petition for permissive appeal, arguing the controlling question of law for the permissive appeal was "[t]he existence of a legal duty." Kenyon's petition did not address her claims of negligence per se and negligent failure to train. Elephant urged this court to grant Kenyon's petition to answer the controlling question of law regarding duty. This court then accepted this permissive appeal.

On original submission, a panel of this court dismissed the appeal in part and affirmed in part. Kenyon timely filed a motion for panel rehearing, which was denied. While this court had

plenary power, the court permitted the filing of a motion for en banc reconsideration, which Kenyon timely filed. After Elephant filed a response, this court ordered en banc reconsideration. We now turn to the merits of this appeal in light of the motion, response, original briefing, and the record before us.

**THE SCOPE OF THIS PERMISSIVE APPEAL IS LIMITED TO THE ISSUE OF DUTY**

The following principles help clarify why the narrow scope of our appellate review in this permissive appeal is limited to the issue of duty.

## A. Summary Judgment Standards

"We review a summary judgment de novo." *Valores Corporativos, S.A. de C.V. v. McLane Co.*, 945 S.W.2d 160, 162 (Tex. App.—San Antonio 1997, writ denied). A de novo review means we "apply[] the same standard that the trial court[] applied in the first instance," *Tex. Mut. Ins. Co. v. Jerrols*, 385 S.W.3d 619, 623 (Tex. App.—Houston [14th Dist.] 2012, pet. dism'd), and we step "in the shoes of the trial judge." TIMOTHY PATTON, SUMMARY JUDGMENTS IN TEXAS § 8.06[1] (3d ed. 2019). We review the record and determine "'anew' all grounds and issues raised by each timely filed motion and response." *Id.* (citing authorities). "[W]e will uphold a summary judgment only if the summary judgment record establishes that there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law on a ground set forth in the motion." *Valores Corporativos*, 945 S.W.2d at 162.

### 1. The Ground Set Forth in the Motion

The scope of our de novo review of summary judgments is limited. *Hardaway v. Nixon*, 544 S.W.3d 402, 412 (Tex. App.—San Antonio 2017, pet. denied). "When a defendant moves for summary judgment, *he must expressly state in the motion the specific grounds upon which relief is sought*, and summary judgment may only be granted on those grounds." *Id.*; *see* TEX. R. CIV. P. 166(c), (i); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 340 (Tex. 1993). "The term

'grounds' means the reasons that entitle the movant to summary judgment, in other words, 'why' the movant should be granted summary judgment." *Hardaway*, 544 S.W.3d at 412. "The scope of a trial court's power to render summary judgment is measured by the scope of the predicate motion for summary judgment and the specific grounds stated therein," and our de novo review is limited accordingly. *Id.* Thus, "a summary judgment cannot be affirmed on grounds not expressly set out in the motion." *See Stiles v. Resolution Tr. Corp.*, 867 S.W.2d 24, 26 (Tex. 1993).

A defendant's summary judgment is a judgment on "a claim [the plaintiff has] asserted." TEX. R. CIV. P. 166a(b). A defendant moving for summary judgment must therefore "meet the plaintiff's causes of action as pleaded." *Dall. Indep. Sch. Dist. v. Finlan*, 27 S.W.3d 220, 231–32 (Tex. App.—Dallas 2000, pet. denied) (citing *Cook v. Brundidge, Fountain, Elliott & Churchill*, 533 S.W.2d 751, 759 (Tex. 1976)). When a defendant's summary judgment ground "fail[s] to meet [the plaintiff's] claim as pleaded, [the] ground cannot support the summary judgment." *Overnite Transp. Co. v. Int'l Bhd. of Teamsters*, No. 03-00-00390-CV, 2001 WL 300247, at *2 (Tex. App.—Austin Mar. 29, 2001, pet. denied) (not designated for publication).[1]

### 2. *The Parties' Respective Evidentiary Burdens on Summary Judgment*

For traditional summary judgment motions, the movant must produce evidence conclusively establishing all material facts to demonstrate its entitlement to judgment as a matter of law on the specific ground expressly presented in the motion. TEX. R. CIV. P. 166a(c); *Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 511 (Tex. 2014). No-evidence

---

[1] *See, e.g.*, *Shellnut v. Wells Fargo Bank, N.A.*, No. 02-15-00204-CV, 2017 WL 1538166, at *5 (Tex. App.—Fort Worth Apr. 27, 2017, pet. denied) (mem. op.) (reversing summary judgment, holding the summary judgment motion mischaracterized plaintiff's claims and challenged issues plaintiff "did not allege"); *Letot v. United Servs. Auto. Ass'n*, No. 05-14-01394-CV, 2017 WL 1536501, at *7 (Tex. App.—Dallas Apr. 27, 2017, pet. denied) (mem. op.) (noting, in reversing summary judgment, defendant "moved for summary judgment on 'no evidence' grounds, but based on a factual theory that [plaintiff] did not allege"); *Yeske v. Piazza Del Arte, Inc.*, 513 S.W.3d 652, 676 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (reversing summary judgment because summary judgment ground challenged a different duty than the one plaintiff alleged); *Finlan*, 27 S.W.3d at 231–32 (reversing summary judgment when the summary judgment grounds too narrowly characterized the plaintiff's claims).

motions for summary judgment must state "there is no evidence of one or more essential elements of a claim." *See* TEX. R. CIV. P. 166a(i). A no-evidence motion may challenge numerous elements "so long as each element or combination of elements is distinctly and explicitly challenged." PATTON, *supra*, § 5.03[2][b] (citing authorities). If the movant's initial summary judgment burden is satisfied, the burden shifts to the non-movant to respond with evidence raising a genuine issue of material fact as to the summary judgment ground. TEX. R. CIV. P. 166a(c), (i); *cf. Amedisys*, 437 S.W.3d at 511. "We review the evidence in the light most favorable to the nonmovant and indulge every reasonable inference and resolve any doubts against the motion." *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 790 (Tex. 2019). Furthermore, "we take as true all evidence favorable to the nonmovant." *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 625 (Tex. 2018).

### 3. Specification of the Ground for Granting Summary Judgment

A trial court is not required to specify the ground on which it grants summary judgment. *See Weiner v. Wasson*, 900 S.W.2d 316, 317 n.2 (Tex. 1995). But when it does, we generally limit our consideration to that ground. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996). In a regular appeal, we "may consider other grounds that the movant preserved for review and trial court did not rule on in the interest of judicial economy." *Id.* But we will do so only "when the record is well developed with regard to those alternate grounds" and when those issues are properly presented on appeal. *In re Brock Specialty Servs., Ltd.*, 286 S.W.3d 649, 657 (Tex. App.—Corpus Christi 2009, orig. proceeding).

### B. Permissive Appeal Standards

Our scope of review is also limited by permissive appeal standards. Under section 51.014(f) of the Texas Civil Practice & Remedies Code, an appellate court has discretionary appellate jurisdiction to accept a timely filed petition for permissive appeal, if the trial court gave written

permission to appeal. TEX. CIV. PRAC. & REM. CODE § 51.014(d), (f); *Sabre Travel Int'l, Ltd. v. Deutsche Lufthansa AG*, 567 S.W.3d 725, 731 (Tex. 2019). Before granting permission to appeal, the trial court must conclude: (1) an immediate appeal may materially advance the litigation's ultimate termination; and (2) the order to be appealed "involves" a controlling question of law for which there is substantial ground for difference of opinion. TEX. CIV. PRAC. & REM. CODE § 51.014(d).

We and other courts have sometimes treated the permissive appeal procedure as a "certified question" procedure similar to federal courts' certification of questions to state court, noting courts and parties "may not add to the trial court's description of the controlling legal question." *See, e.g., Bell v. Chesapeake Energy Corp.*, No. 04-18-00129-CV, 2019 WL 1139584, at *16 (Tex. App.—San Antonio Mar. 13, 2019, pet. filed) (mem. op.). We and other courts have also strictly required a clear substantive ruling on the precise controlling question of law. *See, e.g., City of San Antonio v. Tommy Harral Constr., Inc.*, 486 S.W.3d 77, 84 (Tex. App.—San Antonio 2016, no pet.) (citing authorities). In one case, we held the absence of a substantive ruling on the precise controlling question of law was a jurisdictional defect. *See id.* In another, we held the lack of a substantive ruling was not a jurisdictional defect. *Gulley v. State Farm Lloyds*, 350 S.W.3d 204, 207–08 & n.2 (Tex. App.—San Antonio 2011, no pet.). And, this court has also stated the permissive appeal statute "does not contemplate use of an immediate appeal as a mechanism to present, in effect, a 'certified question' to this Court similar to the procedure used by federal appellate courts in certifying a determinative question of state law to the Texas Supreme Court." *Id.* at 207.

Recently, in *Sabre Travel International v. Deutsche Lufthansa AG*, the Supreme Court of Texas implicitly abrogated our cases strictly confining the scope of review in permissive appeals. 567 S.W.3d at 728. There, the supreme court reframed the controlling question of law, addressed subsidiary and ancillary legal questions not expressly certified in the trial court's order, and held

it had appellate jurisdiction despite the absence of a substantive ruling in the trial court's certification order. *Id.* at 727–41.[2] The supreme court explained, "the Legislature modeled section 51.014(d) after the federal counterpart to permissive interlocutory appeals." *Sabre Travel Int'l*, 567 S.W.3d at 731. In federal permissive interlocutory appeals, "review is not limited to the controlling question of law formulated by the district court in its certification order." *Hines v. Alldredge*, 783 F.3d 197, 200 (5th Cir. 2015). "[T]he scope of the issues . . . is closely limited to the order appealed from, but not to the specific stated question." 16 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. JURIS. § 3929 (3d ed. 2019) (citing authorities).

Nevertheless, our discretionary appellate jurisdiction in a permissive appeal remains limited. First, our jurisdiction is limited to the order or part of the order the trial court granted permission to appeal. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(d), (f). Second, permissive appeals are "intended to be similar" to the supreme court's petition for review procedure. TEX. R. APP. P. 28.3, cmt. to 2011 change; *Sabre Travel Int'l*, 567 S.W.3d at 731. In the supreme court, the "brief on the merits must be confined to the issues or points stated in the petition for review." TEX. R. APP. P. 55.2. Thus, only those issues that are identified in a petition for permissive appeal review are properly before us. *Cf. In re C.O.S.*, 988 S.W.2d 760, 769 (Tex. 1999).

## C. The Existence of a Legal Duty

Explaining the difference between the elements of duty and breach in Texas law also helps to clarify the limited scope of this appeal. In Texas, the elements of a negligence claim are the existence of a legal duty, a breach of that duty, and damages proximately caused by the breach. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 352 (Tex. 2015). The existence of a legal duty is a threshold question. *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 503 (Tex. 2017).

---

[2] *See* Petition for Review, *Sabre Travel Int'l, Ltd. v. Deutsche Lufthansa AG*, No. 17-0538 (July 7, 2017), at Tab A (containing the trial court's order granting permission to appeal).

The threshold question of duty is "grounded in the public policy behind the law of negligence which dictates every person is responsible for injuries which are the reasonably foreseeable consequence of his act or omission." *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009). Notably, what the applicable standard of care requires in a particular case is part of the breach element, not duty. *Windrum v. Kareh*, 581 S.W.3d 761, 768 (Tex. 2019) ("To establish breach of a duty, the plaintiff must establish an applicable standard of care."); *Dobbins v. Mo., Kans. & Tex. Ry. Co. of Tex.*, 41 S.W. 62, 63 (Tex. 1897). Thus, the threshold question of duty does not include whether the facts of the case show a breach. *Pagayon*, 536 S.W.3d at 504.

Although the distinction between duty and breach is, in some cases, "less clear in application than in theory," the Supreme Court of Texas has adopted Dean William Prosser's "view that there are four elements to a negligence cause of action: duty, breach, causation, and damage." VINCENT R. JOHNSON & ALAN GUNN, STUDIES IN AMERICAN TORT LAW 231 (2d ed. 2009); *accord McKinley v. Stripling*, 763 S.W.2d 407, 409 (Tex. 1989) (citing W. KEETON, PROSSER & KEETON ON TORTS § 30 (5th ed. 1984)). The supreme court sometimes combines proximate cause and damages into a single element, but has never combined the existence of a duty and breach of the duty into a single element. *See, e.g.*, *D. Hous., Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002). Although other jurisdictions combine duty and breach under a single element of "negligence," we adhere to the supreme court's longstanding distinction between the two elements, rather than conflate them. JOHNSON & GUNN, *supra*, at 231. Consequently, the mere existence of a duty does not establish "liability" or "negligence"; the existence of a duty is simply a threshold inquiry that, if satisfied, establishes that certain acts or omissions, if found to have breached the applicable standard of care, may result in liability for proximately caused damages. *See McKinley*, 763 S.W.2d at 409.

**D. Conclusion as to the Scope of this Appeal**

The scope of this appeal is limited to the issue of duty. First, we hold we have no discretion to consider other summary judgment grounds because neither party presented any issue other than duty in the petition for permissive appeal and response. *See* TEX. R. APP. P. 28.3, cmt. to 2011 change; *cf. id.* R. 55.2; *C.O.S.*, 988 S.W.2d at 769. Second, we hold Elephant waived or failed to preserve alternative grounds for our consideration by stipulating the issue of a duty was the controlling question of law, and urging us to "accept the appeal and resolve the controlling issue." Third, to the extent we have discretion to address other summary judgment grounds, we decline to do so. The purpose of a permissive appeal is to resolve the substance of the legal question the trial court concluded was controlling because answering the question in an immediate appeal may materially advance the litigation's ultimate termination. *See Sabre Travel Int'l*, 567 S.W.3d at 735–36. Here, the trial court granted Kenyon permission to appeal because the issue of duty was the controlling question of law and the sole basis for summary judgment. To address grounds the trial court did not consider is contrary to the intent of Texas's permissive appeal statute. *See id.* And, we cannot say the record has been sufficiently developed with regard to the alternative grounds in Elephant's motion. *See Brock Specialty Servs.*, 286 S.W.3d at 657. Nor can we say that, given the procedural history of this case, addressing other issues at this point in the proceedings would promote judicial economy.

For these reasons, we confine our review to the duty element of Kenyon's claims, and do not consider the other elements Elephant challenged in the trial court. Applying our standards for permissive appeals and reviewing summary judgments, we conclude our scope of review is limited to the substance of the controlling question of whether Elephant is entitled to summary judgment as a matter of law on Kenyon's negligence claims because Elephant owed no duty to Kenyon. The substance of the controlling question of law necessarily requires addressing whether the parties

satisfied their respective summary judgment burdens as to the duty element of each claim for which the trial court granted Kenyon permission to appeal.[3]

## MISREPRESENTATION UNDER THE INSURANCE CODE & DTPA

In her appellant's brief, Kenyon argued the trial court erred by rendering summary judgment on her misrepresentation claims under the Insurance Code and DTPA. The parties have agreed and the record confirms the trial court did not grant Kenyon permission to appeal as to these claims. We therefore dismiss this issue. *See In re Estate of Trevino*, 195 S.W.3d 223, 226 (Tex. App.—San Antonio 2006, no pet.).

## COMMON LAW NEGLIGENCE

In her live pleading, Kenyon alleged what the trial court referred to in its summary judgment order as the "common law negligence" claim:

> 14. NEGLIGENCE. Due to the special relationship between [Elephant] and the Plaintiffs resulting from the insurer/insured relationship, [Elephant] owed the Plaintiffs [a] duty to act as a reasonable and prudent insurance company when the insureds contacted [Elephant] regarding the claim arising from the single-vehicle accident. [Elephant] breached that duty when it instructed the insureds to take [pictures] from the scene. As a result of the insureds taking the instructed [pictures], Theodore Kenyon (deceased) was struck by [another car] and killed.

Kenyon alleged a duty arose at the time her call related to the processing of her insurance claim. The legal basis for the duty is the special relationship between an insured and insurance company. Although we do not address the merits of the breach element, we note—to address Elephant's arguments—the alleged standard of care is reasonable prudence, and the alleged breach is that Elephant "instructed the insureds to take [pictures] from the scene."

---

[3] We do not address Kenyon's claims of negligence per se and negligent failure to license because those claims were not raised in Kenyon's petition for permissive appeal or in her appellant's brief. *See* TEX. R. APP. P. 38.1(i).

**A. Kenyon adequately briefed an issue as to the duty element of this claim.**

On original submission, the panel disagreed as to whether Kenyon waived her issue as to a common law negligence duty by inadequately briefing the issue; specifically, by failing to use the term "special relationship" sufficiently in her brief. Kenyon challenged this holding in her en banc motion. Elephant has never argued Kenyon inadequately briefed this issue. Given the panel's disagreement, we address the adequacy of Kenyon's appellate briefing.

In her appellant's brief, Kenyon argued the trial court erroneously rendered summary judgment on her common law negligence claim. Kenyon cited to the specific page of the record where the above-quoted claim was pled. Kenyon argued "Elephant owed Mrs. Kenyon the duty to act as a reasonable and prudent insurer" during the phone call, and dedicated six pages, with citations to authority, to arguing the phone call related to Elephant processing her insurance claim. Kenyon clearly argued the trial court erred by granting summary judgment on this claim because Elephant owed her a duty, citing to the duty she alleged based on a special relationship.

We hold Kenyon adequately briefed this issue. First, the brief substantially complies with the requirements to present an issue and argument, with citations to the record and authority, to acquaint us with the issue and enable us to decide the case. *See* TEX. R. APP. P. 38.1(i), 38.9. Although Kenyon's brief does not often use the phrase "special relationship," Kenyon's brief cites to her allegations of a duty arising due to the parties' special relationship and contains arguments about the processing of claims. Kenyon's failure to use "magic words" is not fatal to appellate review of the issue. *See In re I.L.*, 580 S.W.3d 227, 242 (Tex. App.—San Antonio 2019, pet. dism'd). We therefore adhere to the supreme court's "firm[] mandate[] that courts broadly construe issues to encompass the core questions and to reach all issues subsidiary to and fairly included within them." *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 480 (Tex. 2019).

Second, Kenyon's brief assigns error to the trial court granting summary judgment on the duty element of her common law negligence claim. *See San Jacinto River Auth. v. Duke*, 783 S.W.2d 209, 210 (Tex. 1990) (per curiam); *Malooly Bros., Inc. v. Napier*, 461 S.W.2d 119, 121 (Tex. 1970); PATTON, *supra*, at § 8.03[1] (noting the appellant's "burden [is] to specifically attack each basis for the summary judgment"). Elephant has repeatedly demonstrated it has understood Kenyon's use of the term "common law negligence" as referring to the negligence claim based on the alleged special relationship.[4] We will not take a "form-over-substance approach that leads to a rigid application of our preservation rules." *See Rohrmoos Venture*, 578 S.W.3d at 480. We will therefore review the summary judgment de novo.

**B. Kenyon's summary judgment response did not waive her common law negligence claim.**

Elephant argues, "Kenyon waived her common law negligence claim against Elephant" because her summary judgment response "contained no argument regarding the common law duty she asserts in this appeal." We disagree. First, the record does not support this assertion. In paragraph three of her summary judgment response, Kenyon expressly responded to Elephant's mischaracterization of the duty she alleged in support of this claim. Second, a summary judgment cannot be obtained by default; summary judgment motions "must stand or fall on their own merits." *McConnell*, 858 S.W.2d at 342. We must therefore determine whether Elephant's motion stands on its own merits. *See id.*

---

[4] Elephant acknowledged Kenyon had alleged a duty of reasonable prudence based on a special relationship in its summary judgment motion and reply, appellee's brief, its en banc response, and at oral argument.

**C. Elephant's summary judgment grounds do not establish its entitlement to judgment as a matter of law on Kenyon's common law negligence claim.**

In arguing the trial court erred by rendering summary judgment on her common law negligence claim, Kenyon argues Elephant's summary judgment motion is deficient. She also argues the evidence raises a fact issue as to the duty she alleged.

*1. Elephant's Traditional Summary Judgment Ground*

Elephant's traditional summary judgment ground on the duty element is deficient in three ways. Each deficiency prevents the motion from establishing Elephant's entitlement to judgment as a matter of law on Kenyon's common law negligence claim "as pleaded."[5]

*a. The traditional ground fails to meet Kenyon's claim as pleaded.*

Elephant's traditional summary judgment ground on the duty Kenyon alleged in support of her common law negligence claim was that an insurance company "owes no duty to protect its insureds' physical safety." Kenyon argues on appeal, as she did in her summary judgment response, that she did not allege Elephant owed a duty to protect its insureds' physical safety, and instead alleged a duty of reasonable prudence that exists due to the special relationship between

---

[5] The entirety of the traditional summary judgment ground on this claim is as follows:

**A. Negligence**

In support of her negligence claim, Kenyon alleges that Elephant owed her and her husband a duty to act as a reasonable and prudent insurance company due to the "special relationship" between insurer and insured. The special relationship between insurer and insured gives rise to a duty of good faith and fair dealing based on the parties' unequal bargaining power and exclusive control that the insurer exercises over the processing of claims. This special relationship imposes a duty on the insurer to investigate claims thoroughly and in good faith, and to deny those claims only after an investigation reveals a reasonable basis to do so. To prevail on a claim for breach of the duty of good faith and fair dealing, the insured **must establish that the insurer failed to settle or delayed settlement of a claim** when the insurer knew or should have known that it was reasonably clear that the claim was covered.

Kenyon's negligence claim fails because **her allegation that Elephant failed to exercise ordinary care when it "instructed" her to take [pictures] has nothing to do with the processing of claims or Elephant's failure or delay in paying a claim**. Rather, her complaint is that Elephant failed to ensure her husband's safety – a duty Elephant does not owe its insureds. **Because Elephant owes no duty to protect its insureds' physical safety**, Elephant is entitled to summary judgment on Kenyon's negligence cause of action. (emphasis added) (citations omitted).

an insurance company and its insured. In its appellee's brief, Elephant does not dispute its summary judgment ground was limited to challenging the existence of a duty to protect its insureds' physical safety. Elephant concedes Kenyon never alleged this duty, acknowledging that in her summary judgment response, "Kenyon specifically disavowed that Elephant owed a duty to protect its insureds' physical safety."[6]

The parties do not dispute there is a difference between a duty of reasonable prudence that exists due to a special relationship between an insurance company and its insured, which Kenyon alleged, and a duty to affirmatively act for another's protection or safety, which is owed in other special relationships that Kenyon did not allege. As between an insurance company and its insured, a special relationship and duty arise for reasons unique to the insurance context. *See Arnold v. Nat'l Cty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987). Kenyon did not allege a general duty to act for the protection of others' physical safety, which exists in special relationships that arise because a defendant exercises a high degree of control over other people or property. RESTATEMENT (SECOND) OF TORTS § 314–314B (1965). Such special relationships include common carrier to passenger, innkeeper to guest, landowner to invitee, employer to employee, and custodian to person in custody. *Id.*[7] Kenyon did not allege any of these special relationships, which give rise to a duty to affirmatively act for another's safety that can be breached by omission (nonfeasance). Instead, Kenyon alleged the special relationship in the insurance context, which

---

[6] In her reply brief, Kenyon "again disavow[ed] that she is making that claim regarding the duty [to protect] owed by Elephant to its insureds. And she will continue to do so whenever asked." She "agree[d] that Elephant owes no such duty" to protect. She also provided further arguments in support of her common law negligence claim. Although reply briefs may not raise new issues, courts may consider arguments asserted in the reply brief that expand upon the issues presented in an appellant's brief. *McAlester Fuel Co. v. Smith Int'l, Inc.*, 257 S.W.3d 732, 737 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); *see Benge v. Harris*, No. 07-13-00064-CV, 2013 WL 4528885, at *1 (Tex. App.—Amarillo Aug. 20, 2013, no pet.) (mem. op.).

[7] *See, e.g.*, *Timberwalk Apts., Partners v. Cain*, 972 S.W.2d 749, 756 (Tex. 1998) (noting one who controls premises may owe a duty to protect); *Rodriguez v. Spencer*, 902 S.W.2d 37, 43 (Tex. App.—Houston [1st Dist.] 1995, no writ) (recognizing "a parent's duty to protect third parties from the acts of the parent's minor children" that could foreseeably result in harm).

gave rise to a duty of reasonable prudence that was breached by Elephant's affirmative act of instructing her to take pictures (misfeasance).

The parties' arguments and the summary judgment record establish Elephant's "no duty" ground challenges the existence of a duty that Kenyon never alleged. Elephant's summary judgment ground therefore fails to meet Kenyon's common law negligence claim as pleaded. *See Cook*, 533 S.W.2d at 759; *Finlan*, 27 S.W.3d at 231–32; *Overnite Transp. Co.*, 2001 WL 300247, at *2. Thus, Elephant's ground challenging the existence of a duty to protect its insureds' physical safety does not support summary judgment.

   b.   *Elephant's motion admits the existence of the duty Kenyon alleged.*

Citing *Arnold v. National County Mutual Fire Insurance Co.*, Elephant's traditional summary judgment motion acknowledged "the insurer-insured relationship ***imposes a duty on the insurer to investigate claims thoroughly and in good faith***" (emphasis added). 725 S.W.2d at 167. Under *Arnold*, "a duty is imposed" on an insurance company to exercise "that degree of care and diligence which a man of ordinary care and prudence would exercise in the management of his own business." *Id.* Elephant argued, "Kenyon's negligence claim fails because her allegation that Elephant failed to exercise ordinary care when it 'instructed' her to take [pictures] has nothing to do with the processing of claims or Elephant's failure or delay in paying a claim." This ground expressly challenges Kenyon's allegation as to how "Elephant failed to exercise reasonable care," which clearly is an issue of breach, not duty. As noted above, the scope of this permissive appeal is limited to the issue of duty. Although delaying payment or failing to pay a claim can constitute a breach of the duty Kenyon alleged, "[t]he question is . . . not whether the facts of the case at hand show a breach." *Pagayon*, 536 S.W.3d at 504. Elephant's summary judgment motion and appellee's brief expressly acknowledge the existence of the specific duty Kenyon alleged in support of her common law negligence claim. *See Arnold*, 725 S.W.2d at 167. By affirmatively

acknowledging the existence of a duty that arises due to a special relationship, as Kenyon alleged, Elephant's summary judgment motion cannot support summary judgment on the ground that Elephant "owed no duty."

> *c. Elephant did not conclusively establish all material facts in support of its traditional ground.*

Even if Elephant's traditional ground constituted an express challenge to the existence of a duty in support of Kenyon's common law negligence claim, Elephant's specific summary judgment ground was that its instruction to take pictures at the scene of the accident had "nothing to do with the processing of claims or Elephant's failure or delay in paying a claim." On appeal, Kenyon argues the call and instruction were related to the processing of claims. We agree.

The summary judgment evidence shows Kenyon called Elephant to report an accident pursuant to the terms of her auto insurance policy. During this call, Elephant's FNOL representative Moritz instructed Kenyon, "Go ahead and take pictures." Elephant's policy required Kenyon to "Provide us with all photographs . . . the person has" and to provide "accident or loss information as soon as practicable." Elephant requests accident scene pictures from insureds to "document vehicle damage" and "determine liability." As detailed in our analysis of the negligent undertaking claim, the summary judgment evidence shows Elephant's request or instruction that Kenyon take accident scene pictures "has [some]thing to do with the processing [or paying] of claims." Even if Elephant's "no breach" ground expressly challenged the existence of a duty, we hold Elephant failed to satisfy its traditional summary judgment burden to conclusively establish all material facts in support of the specific ground it expressly presented in its motion. *See* TEX. R. CIV. P. 166a(c); *Amedisys*, 437 S.W.3d at 511.

### 2. *Elephant's No-Evidence Ground*

In footnote four of its en banc response, Elephant argued for the first time it challenged the existence of a duty in its no-evidence motion. In its summary judgment motion, Elephant's sole no-evidence ground challenging Kenyon's common law claim is as follows:

> To prevail on a negligence cause of action, a plaintiff must establish: (1) the defendant owed the plaintiff a duty according to a certain standard of care; (2) the defendant breached the applicable standard of care; and (3) damages proximately resulted from that breach. Elephant is entitled to summary judgment on Kenyon's negligence claim because Kenyon can ***produce no evidence that Elephant breached any duty*** or standard of care imposed by Texas law.

(citation omitted) (emphasis added). We hold this ground does not challenge the duty element of Kenyon's common law negligence claim.

First, the ground does not state the "existence of a duty" is an "element[] as to which there is no evidence," and the element of duty is not "distinctly and explicitly challenged." *See* TEX. R. CIV. P. 166a(i); PATTON, *supra*, § 5.03[2][b]. We "cannot 'read between the lines' or infer from the pleadings any grounds for granting the summary judgment other than those grounds expressly set forth before the trial court." *Nall v. Plunkett*, 404 S.W.3d 552, 556 (Tex. 2013) (per curiam). In summary judgment cases, our sister courts have used the language "no breach of any duty" to refer only to a challenge to the breach element.[8] And, the supreme court has always distinguished between the elements of duty and breach. *See Pagayon*, 536 S.W.3d at 504.

Second, a summary judgment ground stating there is "no evidence of a breach of any duty" can challenge the existence of a duty if the ground is clearly based on a defense that there

---

[8] *See, e.g.*, *Peterson v. Midstate Envt'l Servs., L.P.*, No.10-16-00162-CV, 2019 WL 91587, at *2 (Tex. App.—Waco Jan. 2, 2019, pet. denied) (mem. op.) (using the phrase "evidence to show that [defendants] breached any duty" as challenging breach, but not duty); *Preston Nat'l Bank v. Stuttgart Auto Ctr. Inc.*, No. 05-09-00020-CV, 2010 WL 3310727, at *3 (Tex. App.—Dallas Aug. 24, 2010, no pet.) (mem. op.) (using the phrase "breached any duty or was the 'proximate or producing' cause" to refer to challenges to breach and causation, but not breach); *Aleman v. Ben E. Keith Co.*, 227 S.W.3d 304, 308 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("Keith moved for summary judgment on the grounds that Aleman had produced no evidence that Keith breached any duty, or that any such breach proximately caused Aleman's injury. Keith did not challenge the element of duty.").

is no duty. In *Jack in the Box, Inc. v. Skiles*, the supreme court held a no-evidence ground stating "there [is] no evidence [defendant] breached any duty owed to [plaintiff]" constituted a challenge to the existence of a duty, but the defendant had "asserted, among other defenses, that it owed no duty to warn [the plaintiff] of obvious dangers and moved for summary judgment." *See* 221 S.W.3d 566, 566–67 (Tex. 2007) (per curiam). Here, however, Elephant's no-evidence ground did not expressly argue there was no breach because there was, in fact, no duty. Instead, Elephant's summary judgment motion had previously acknowledged the existence of the special relationship and duty Kenyon alleged.

Third, we cannot say the above-quoted ground gave fair notice of a no-evidence challenge to the existence of a duty. *See Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009). The applicable standard is whether an opposing attorney of reasonable competence, on review of the pleadings, can ascertain the nature and the basic issues of the controversy. *Cf. Bowen v. Robinson*, 227 S.W.3d 86, 91 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). Fair notice must be determined from the pleading as a whole. *See id.* at 91–92. Before this no-evidence ground, Elephant's traditional ground admitted the existence of the "special relationship" duty Kenyon alleged, and challenged whether the facts of the case—the instruction—breached this duty. This traditional ground mirrors the only reasonable reading of Elephant's no-evidence ground. Also, Kenyon has never acknowledged Elephant asserted a no-evidence ground challenging the existence of a duty; rather, Elephant has claimed "Kenyon waived her common law negligence claim against Elephant" because her summary judgment response "contained no argument regarding the common law duty she asserts in this appeal." Likewise, until its en banc response, Elephant has never referred to its no-evidence ground as challenging the existence of a duty. In its summary judgment reply and appellee's brief, Elephant cited only to the traditional ground, explaining Elephant "moved for summary judgment on this claim," arguing the special relationship

"does not give rise to a duty to protect the insured's physical safety." We cannot say that a reasonably competent attorney would have understood Elephant's no-evidence ground as plausibly challenging the existence of a duty. *See id.*

Fourth, the trial court did not grant summary judgment on the ground that Elephant did not "breach[] any duty or standard of care imposed by Texas law." The trial court granted summary judgment on the ground that Elephant "owed no duty to Plaintiffs." The ground the trial court specified is the traditional ground in which Elephant expressly argued there is no duty, not the no-evidence ground that Elephant did not "breach any duty." As noted above, our scope of review is limited to the specific ground on which the trial court rendered summary judgment. We therefore hold Elephant's no-evidence ground is not a basis on which the trial court's summary judgment on Kenyon's common law negligence claim may be affirmed.

*3. Alternatively, the summary judgment evidence raises a fact issue as to the existence of a duty that arises due to the parties' special relationship.*

We address the substance of the duty element of this claim in an abundance of caution. Even if Elephant's summary judgment motion challenged the duty Kenyon alleged, we alternatively hold Kenyon produced sufficient evidence raising a fact issue as to the existence of a duty that arises due to the parties' special relationship. This special relationship arises out of the contractual relationship created by the insurance policy. *Arnold*, 725 S.W.2d at 167. "In *Arnold*, [the supreme court] recognized the duty of an insurer to deal fairly and in good faith with its insured in the processing . . . of claims and that breach of that duty is compensable in tort." *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex. 1990). As explained above, the evidence raises a fact issue as to this specific ground because the evidence shows Elephant instructed Kenyon to take pictures during and in furtherance of Elephant's "processing . . . of [Kenyon's] claims." *See id.*

When Kenyon called to report her claim, the call implicated the parties' special relationship and therefore, while Kenyon was on the call reporting her claim, Elephant owed Kenyon a duty. *See id.* This squarely answers the question of whether "Elephant owed no duty to [Kenyon]," as the trial court specified the issue in its summary judgment order. Elephant attempts to reframe the issue as whether this duty, which it emphasizes is a duty of good faith and fair dealing, "extends" to or "implicates" the facts of this case (i.e. the instruction to take pictures). As noted above, the question is whether a duty exists "not whether the facts of the case at hand show a breach." *Pagayon*, 536 S.W.3d at 504. Although the applicable standard of care is referred to as one of "good faith and fair dealing," the standard is ultimately one of reasonableness, or "ordinary care and prudence." *Arnold*, 725 S.W.2d at 167; *see AIG Aviation, Inc. v. Holt Helicopters, Inc.*, 198 S.W.3d 276, 285 (Tex. App.—San Antonio 2006, pet. denied).[9] This court has recognized this duty extends to "reasonably investigat[ing] a claim." *State Farm Mut. Auto. Ass'n v. Cook*, 591 S.W.3d 677, 680 (Tex. App.—San Antonio 2019, no pet.). Because Elephant instructed Kenyon to take pictures to process Kenyon's insurance claim, the special relationship duty that applies in claims processing "extends" to or "implicates" the instruction to take pictures; the issue of whether the instruction breached the standard of care is beyond the limited scope of this appeal. *See Pagayon*, 536 S.W.3d at 504.

Elephant argues the duty Kenyon alleged covers only "extra-contractual financial loss, not damages for physical harm the insured may sustain." We disagree. First, Elephant's argument relates to the damages available for such a cause of action; not to the existence of a duty. As with

---

[9] Elephant's summary judgment ground does not argue that Kenyon's evidence or allegations fail to show its instruction was made in bad faith. Kenyon alleged Elephant had no reasonable basis to request pictures and intentionally misrepresented the need for pictures. Kenyon then incorporated these factual allegations in arguing her legal theory of her common-law negligence claim. Kenyon also argued in the trial court that by instructing Kenyon to take pictures, Elephant was simply seeking a reason to deny her claim. Because this issue goes into the element of breach, we need not reach whether: (1) Kenyon must prove bad faith to establish a breach of the duty she alleged; or (2) whether the pleadings or evidence raise the issue of the instruction being given in bad faith.

Elephant's arguments attempting to "work backwards" from the breach element, this argument attempts to "work backwards" from the element of damages. As noted above, the scope of this appeal is limited to duty. Second, Elephant did not expressly present this issue in its summary judgment motion, and "a summary judgment cannot be affirmed on grounds not expressly set out in the motion or response." *See Stiles*, 867 S.W.2d at 26. Third, the purpose of tort law, and negligence specifically, is to be "a vehicle of legal redress for victims of physical injury." JOHNSON & GUNN, *supra*, at 3; *see Escoto*, 288 S.W.3d at 404. We therefore see no reason why, if an insurance company breaches the duty that arises due to a special relationship, and foreseeably causes economic damages and personal injury, liability would be limited only to economic damages and not include personal injury damages.[10]

### D. Conclusion as to Kenyon's Common Law Negligence Claim

The trial court erred by concluding Elephant's summary judgment ground conclusively established the absence of the duty Kenyon alleged in support of her common law negligence claim. We hold Elephant's summary judgment grounds do not support summary judgment on the issue of duty. Alternatively, Kenyon produced sufficient evidence raising a fact issue as to the existence of the duty she alleged.

NEGLIGENT UNDERTAKING

Kenyon argues the trial court erred by rendering summary judgment on her negligent undertaking claim. Kenyon alleged her negligent undertaking claim as follows:

15. NEGLIGENT UNDERTAKING. Alternatively, and additionally, if [Elephant] did not owe a duty to the Plaintiffs as a result of their status as insureds, then a separate duty was created when [Elephant] undertook to guide the Plaintiffs through

---

[10] For example, if a person on the roadside is struck and killed by a car while performing an unreasonably dangerous task required by the insurance company during its investigation, and the insured's death allowed the insurance company to delay payment of the claim, it would make little sense that the insured's estate could recover economic damages resulting from any wrongful delay of the insured's claim caused by the insured's death, but not recover foreseeable damages resulting from the insured's death itself.

the post-accident events in response to the Plaintiffs simply calling in to make a property damage claim. When the Plaintiffs called to make a claim the First Notice of Loss ("FNOL") employee (Moritz) undertook to guide the insureds through the post-accident events, including beginning [Elephant's] investigation of the claim. [Elephant] undertook these actions knowing that the insureds were looking to [Elephant] to protect their interests and themselves. The insureds relied on [Elephant's] performance of those services and/or [Elephant's] performance of those services increased the risk of harm to the insureds/Plaintiffs. [Elephant's] negligence proximately caused the Plaintiffs injuries as described herein.

Although Elephant argues Kenyon never articulated what service Elephant undertook, Kenyon alleged the undertaking giving rise to a duty was that Moritz began "guid[ing] the insureds through the post-accident events, including beginning [Elephant]'s investigation of the claim."

A negligent undertaking duty arises when: (1) the defendant voluntarily undertakes to perform services it knew or should have known were necessary for the plaintiff's benefit or protection; and (2) the plaintiff relies on the defendant's performance, or the defendant's performance increases the risk of harm. *Midwest Employers Cas. Co. ex rel. English v. Harpole*, 293 S.W.3d 770, 777–78 (Tex. App.—San Antonio 2009, no pet.) (citing *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000)).[11] Elephant's no-evidence and traditional grounds challenged certain components of these requirements.

## A. The Benefit or Protection Requirement

As to the benefit or protection requirement, Elephant's traditional summary judgment motion argued it "did not undertake an affirmative course of action for the Kenyons' benefit or protection." In its no-evidence ground, Elephant argued, "Kenyon can produce no evidence that Elephant undertook to perform any services that it knew or reasonably should have known were

---

[11] A negligent undertaking claim also requires the plaintiff to show the defendant "failed to exercise reasonable care in performing those services" and such breach proximately caused the plaintiff's injuries." *See id.* at 778; *Doe v. Messina*, 349 S.W.3d 797, 800 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). These elements are the breach and proximate cause elements. As noted above, our review is narrowly limited to the issue of duty.

necessary for the Kenyons' protection." Kenyon argues the evidence raises a fact issue as to the benefit or protection requirement.

### 1. *Judicial Admission*

Elephant argues, "Kenyon admits in her brief that Elephant's conduct was for its own benefit" and "admits . . . Elephant gathered information 'only to benefit itself.'" Kenyon responds this characterization takes her statement out of context. A statement in an appellant's brief is not a binding judicial admission unless the statement is "sufficiently deliberate, clear, and unequivocal for us to accept as true." *Fayette County v. Ryder Integrated Logistics, Inc.*, No. 04-16-00574-CV, 2017 WL 1244440, at *3 n.1 (Tex. App.—San Antonio Apr. 5, 2017, no pet.) (mem. op.). In her appellant's brief, Kenyon argued in four paragraphs the reasons for which Elephant's undertaking is actionable. Kenyon stated Elephant performed these services "only to benefit itself, and was intentionally indifferent to [the Kenyons'] safety." When viewed in context of all of Kenyon's briefing on this issue, however, we hold the above-quoted language is not sufficiently deliberate, clear, and unequivocal to constitute a judicial admission as to whether Elephant's services were provided for Kenyon's benefit or protection. *See id.*

### 2. *The evidence raises a fact issue as to the benefit or protection requirement.*

Kenyon produced evidence showing Elephant provided post-accident guidance and opened its investigation of her insurance claim during the FNOL call. This summary judgment evidence raises a genuine issue of material fact as to whether Elephant performed a service it knew or reasonably should have known was for Kenyon's benefit or protection.

### a. *Post-Accident Guidance, Including Opening an Insurance Investigation*

Elephant argues merely answering the phone when Kenyon called and instructing her to take pictures is not evidence showing it undertook to provide any service for Kenyon's protection or benefit. Elephant focuses on the instruction and phone call in isolation. However, the summary

judgment evidence shows the phone call and instruction were not acts in isolation, but acts taken in context of Elephant providing insurance services to Kenyon. As explained above, the purpose of Elephant answering Kenyon's phone call and its instruction to take pictures was to process her claim under her auto insurance policy. We hold the summary judgment evidence, considered together, raises a fact issue as to the benefit or protection requirement.

Insurance services generally are undertaken for another's benefit or protection. *See Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 120 (Tex. 1976). The "manifest purpose" of providing insurance coverage is for the benefit or protection of the insured. *See In re Deepwater Horizon*, 470 S.W.3d 452, 467 (Tex. 2015).[12] Thus, in *Colonial Savings*, the supreme court held a lienholder assumed a negligent undertaking duty by obtaining fire insurance coverage for a homeowner. 544 S.W.2d at 120. Here, the benefit and protection the auto insurance policy provided is manifested in the text of the policy itself. The policy included, "Personal Injury **Protection** Coverage" (emphasis added), which is a promise to pay certain benefits and expenses "for bodily injury sustained by the Insured in a motor vehicle accident" for both the insured and the insured's spouse. Elephant's services also included coverage for "Damage to an Auto" (i.e. collision coverage), which is a promise to pay for damage to a car covered under an insurance policy. Thus, Kenyon's auto insurance policy with Elephant shows the purpose of the policy—like insurance generally—is to benefit and protect its insureds against losses from certain auto-related property damage and personal injury.

Thus, an insurance company can assume a negligent undertaking duty by performing certain insurance-related services for an insured. *See Keightley v. Republic Ins. Co.*, 946 S.W.2d

---

[12] *See also Tellepsen Builders, L.P. v. Kendall/Heaton Assocs.*, 325 S.W.3d 692, 697 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Property coverage protects an insured from loss to property . . . .") (quoting 4 PHILIP L. BRUNER & PATRICK J. O'CONNOR, JR., BRUNER & O'CONNOR ON CONSTRUCTION LAW § 11:106, at 336–37 (2002)); BLACK'S LAW DICTIONARY 823 (8th ed. 2006) (defining "insured" as someone covered or "protected by" an insurance policy).

124, 126 (Tex. App.—Austin 1997, no writ); *Seay v. Travelers Indem. Co.*, 730 S.W.2d 774, 775 (Tex. App.—Dallas 1987, no writ). In *Keightley*, an insurance company that provided services of administering the plaintiff's reinsurance policies assumed a negligent undertaking duty by "voluntarily enter[ing] upon an affirmative course of action affecting another's interest." 946 S.W.2d at 129. In *Seay*, the court of appeals recognized, in a wrongful death case, an insurance company that performed services of inspecting a water boiler assumed a negligent undertaking duty to the insured's maintenance employee, who died from injuries caused by the boiler discharging scalding hot water. 730 S.W.2d at 775.[13]

Conducting an insurance investigation is a service that can give rise to a negligent undertaking claim. *See Thomas v. Select Portfolio Servicing, Inc.*, 293 S.W.3d 316, 322 (Tex. App.—Beaumont 2009, no pet.); *W. Hills Bowling Ctr., Inc. v. Hartford Fire Ins. Co.*, 412 F.2d 563, 565–66 (5th Cir. 1969). The facts of *Western Hills Bowling Center, Inc. v. Hartford Fire Insurance Company* are particularly instructive. *See* 412 F.2d at 564–65. The Western Hills Bowling Center was partially destroyed by a fire, the owner reported the loss to its insurance company, and the insurance company "specifically instructed" the owner to follow the adjuster's further instructions. *Id.* at 564–66. The adjuster, in turn, "persisted in its instructions that [the owner] was not to begin clean-up or salvage operations until the investigation was complete." *Id.* at 565. Before the investigation was complete, a second fire entirely destroyed the bowling alley.

---

[13] Other states have recognized that providing certain insurance services can support a negligent undertaking claim. *See, e.g., Cleveland v. Am. Motorists Ins. Co.*, 295 S.E.2d 190, 193 (Ga. Ct. App. 1982) (holding negligent undertaking theory was available by insured against insurance company whose negligent inspection of a boiler resulted in personal injury caused by boiler's explosion); *Hadler v. Great E. Life Ins. Co.*, 256 A.2d 650, 652 (N.H. 1969) (holding insurance company owed negligent undertaking duty when it agreed to provide insurance coverage, but failed to issue the policy). Other states have also recognized an insurance company may be held liable for wrongful death under a negligent undertaking theory. *See, e.g., Life Ins. Co. of Ga. v. Lopez*, 443 So. 2d 947, 950 (Fla. 1983); *Liberty Nat'l Life Ins. v. Weldon*, 100 So.2d 696 (Ala. 1957).

*Id.* The insured sued its insurance company for negligent undertaking, and the jury found in favor of the insured, but the district court set aside the jury's findings. *Id.* at 564–65.

The Fifth Circuit reversed, holding that once the insurance company and adjuster "undertook an investigation, they were bound under the applicable Texas substantive law to exercise reasonable care and diligence in its execution and [were] liable for any loss or injury caused by their failure to do so." *Id.* at 565. "Having exercised their right under the contract of insurance to undertake an investigation, the insurers cannot interpose the absence of a prior duty as a defense against a claimant injured as a result of their failure to exercise due care." *Id.* at 565–66. The Fifth Circuit rendered judgment for the insured. *Id.* at 567.

This principle is also demonstrated by *Thomas v. Select Portfolio Servicing, Inc.* In *Thomas*, a homeowner sued an insurance company for property damages resulting from a negligent insurance investigation. 293 S.W.3d at 318. Thomas alleged two types of property damage. *Id.* at 321. The primary claim was that the insurance agents had removed a blue tarp installed by FEMA, and failed to replace the tarp, which later caused leaks damaging the property. *Id.* A secondary claim was that insurance agents "walked on the roof and extensively used the hammer on the roof, causing further damages to the roof." *Id.* Thomas also alleged the insurance company's adjusters went "on Thomas's roof to evaluate [an] insurance claim." *Id.* The insurance company argued Texas does not recognize a cause of action for negligent claims handling and "if a general duty in the performance of services exists, Thomas could not pursue a claim because the service it was performing was claims handling." *Id.* at 322. The court held the economic loss rule[14] did not bar a

---

[14] Elephant states Texas law does not recognize a cause of action for negligent handling of insurance claims. That Texas does not recognize such a cause of action is merely a restatement of the economic loss rule: that a plaintiff cannot recover for negligent handling of an insurance claim when losses are purely economic and limited to the subject matter of the insurance policy. *See Spring St. Apts Waco, LLC v. Phil. Indem. Ins. Co.*, W-16-CA-00315-JCM, 2017 WL 5248416, at *2 (W.D. Tex. Apr. 6, 2017). The economic loss rule does not negate the existence of a tort duty separate from the contractual duties in the policy, was not raised in Elephant's summary judgment motion, and does not apply in this case because Kenyon's alleged damages are based on bodily injury. *See Thomas*, 293 S.W.3d at 318.

cause of action for negligent claims handling because the alleged damages included property damage beyond the subject matter of the insurance policy. *Id.*

Elephant argues *Thomas* is a negligent activity case only, and not a negligent undertaking case. We disagree. The court directly addressed a negligent undertaking duty (i.e. whether removal of the tarp was a negligent "performance of services"), and held that, even though the negligent undertaking claim was, in effect, a cause of action for negligent claims handling not recognized in Texas law, the insurance company "read[] Thomas's pleadings too narrowly." *Id.* Thus, *Thomas*, like *Western Hills Bowling Center*, involves a negligent insurance investigation claim, which is a species of a negligent undertaking claim. *See* 2A AM. L. OF TORTS §§ 9:15, 9.18 (2019) (treating negligent inspections and investigations as "part and parcel of the broader liability to another or to a third person for negligent performance of an undertaking").[15]

The summary judgment evidence here raises a fact issue as to whether Elephant's post-accident guidance included opening its investigation of her claim. *See W. Hills Bowling Ctr.*, 412 F.2d at 564–65. Under Elephant's auto insurance policy, claims processing commences with the insured reporting the accident or loss within 24 hours or as soon as practicable. The policy requires insureds like Kenyon to "Cooperate With [Elephant] in the investigation . . . of any claim." The policy defines several terms, but not "investigation" or "investigate." The policy also does not limit "investigations" to only fraud investigations, but instead applies to "the investigation" of the claim. The ordinary meaning of "investigate" is to "make inquiries" into "character, activities or background." OXFORD AM. DICTIONARY 914 ("investigate," *v.*); *see U.S. Metals, Inc. v. Liberty*

---

[15] *See also Gulf Ins. Co. v. Cunningham*, No. A14-91-00799-CV, 1993 WL 136039, at *3 (Tex. App.—Houston [14th Dist.] Apr. 29, 1993, writ denied) (recognizing a cause of action when a surety "performed an investigation of the appellees' claim, and it did so negligently").

*Mut. Grp., Inc.*, 490 S.W.3d 20, 23 (Tex. 2015) (stating we give words in insurance policy their plain meaning).

During the phone call, in addition to accepting Kenyon's report of the accident, Moritz made numerous inquiries as to Kenyon's recent activities and her background information; encouraged her to call the police; and said, "Go ahead and take pictures." The summary judgment evidence shows Elephant trained its FNOL representatives to obtain police information and pictures "on every FNOL call, every time," and the express purpose for doing so was because the adjuster "may need [that information] to determine liability." Elephant has acknowledged the purpose of FNOL calls is to "facilitate gathering . . . evidence . . . to adjust insureds' claims." The evidence raises a fact issue as to whether Elephant began its investigation of Kenyon's claim during the FNOL call.

The facts of this case, while in a different context than *Western Hills Bowling Center*, are sufficiently analogous on the issue of whether an insurance investigation gives rise to a negligent undertaking duty. In both cases, an insured suffered an initial loss; the insured reported the loss to the insurance company; the insurance company began its investigation and gave the insured instructions; the insured followed the instructions; and the insured suffered a subsequent loss as an alleged result of following instructions. *See* 412 F.2d at 564–65.[16] The evidence raises a fact issue as to whether Elephant opened an insurance investigation, which—under *Western Hills Bowling Center* and other "negligent insurance investigation" cases—is a service for Kenyon's

---

[16] In *City of Denton v. Page*, the supreme court declined to extend *Western Hills* to a premises liability claim alleging the City's fire marshal had a duty to remedy and warn about a dangerous real property condition because the fire marshal did not control the premises. *See* 701 S.W.2d 831, 834–35 (Tex. 1986). *Page*'s distinction is inapplicable to this case because Kenyon does not allege premises liability or a duty to warn or repair. However, the supreme court in *Page* also noted the insurer in *Western Hills Bowling Center* "took control of the premises and prevented the insured, the owner, from taking steps to protect his property," which, under the facts of *Western Hills*, was effectuated by conducting an insurance investigation and giving instructions to the insured. *Id.* at 835. The supreme court has therefore recognized that an insurance company can, even remotely, exercise control over an insured and her surroundings by giving the insured an instruction. *See id.* at 834–35.

benefit or protection. *See id.* Consequently, "once [Elephant] undertook an investigation, [it was] bound under the applicable Texas substantive law to exercise reasonable care and diligence." *See id.*

### b. Other Post-Accident Guidance

The summary judgment evidence also raises a fact issue as to whether Elephant's post-accident guidance included providing roadside assistance services, which a factfinder could reasonably infer was a service for the Kenyons' benefit or protection. Both parties rely heavily on the call transcript. During the phone call, Moritz told Kenyon, "It does look like you have roadside assistance towing on the policy, so what I can do is, I can go ahead and transfer you over to them, that way . . . they can help you out with getting the vehicle towed." A jury could reasonably infer Elephant knew or should have recognized roadside assistance was for Kenyon's benefit or protection. *See Torrington*, 46 S.W.3d at 838; *Colonial Sav. Ass'n*, 544 S.W.2d at 120.

### c. Elephant's Arguments

Elephant argues (1) its requests for pictures and police information on every FNOL call does not raise a fact issue "because a company's internal policies and procedures will not create a negligence duty where none otherwise exists"; (2) Elephant provided services involuntarily or for its own benefit because it was acting under a "duty imposed on Elephant under Texas law"; and (3) Elephant never undertook an action for the benefit or protection of the Kenyons' physical safety, and any duty it owed is limited to the anticipated benefit or protection of its services.

#### i. Policies & Procedures

The cases Elephant cites hold that policies and procedures alone—unaccompanied by any affirmative course of action—will not give rise to liability for a failure to act in accordance with those policies or procedures. *See, e.g.*, *Cleveland Reg'l Med. Ctr., L.P. v. Celtic Props., L.C.*, 323 S.W.3d 322, 351 (Tex. App.—Beaumont 2010, pet. denied). The evidence shows Moritz

undertook an affirmative course of action in accordance with Elephant's policy or procedure of requesting police information and pictures on every FNOL call. Thus, Kenyon is not alleging a negligent undertaking duty based merely on the existence of policies or procedures alone, but upon an affirmative course of action consistent with Elephant's policies or procedures.

### ii. Involuntariness

Elephant argues the alleged instruction and requests for information during the phone call were merely "to promptly investigate and settle Kenyon's claim – a duty imposed on Elephant under Texas law." Elephant appears to argue its undertaking was not "voluntary" because the undertaking was required by Texas law. Elephant did not move for summary judgment on this basis. Elephant's traditional ground noted voluntariness is a requirement of a negligent undertaking duty, but limited its challenge to not having undertaken "any service for the Kenyons' protection or benefit." Elephant's no-evidence ground did not mention the voluntariness requirement and did not state there is no evidence that the alleged undertaking was voluntary or not required by Texas law. We therefore hold summary judgment cannot be affirmed on the basis of involuntariness. *See Stiles*, 867 S.W.2d at 26. Elephant's argument is also inconsistent with negligent insurance investigation cases in Texas and in other states. *See, e.g.*, *W. Hills Bowling Ctr*, 412 F.2d at 564–65; *Thomas*, 293 S.W.3d at 318; *see supra* n.13.

### iii. Damages Unrelated to the Expected Benefit or Protection

In the trial court and on appeal, Elephant has emphasized the Kenyons' physical safety. As with the common law duty, Elephant argues that because the services it performed were not to benefit or protect the Kenyons' physical safety, Elephant's negligent undertaking duty does not include "any duty to exercise ordinary care with regard to Theodore's bodily injuries and death." Elephant seems to argue the benefit or protection for which a service is performed limits the

recoverable damages, and because the phone call and instruction were not intended to protect Kenyon from bodily injury, Kenyon cannot recover personal injury damages.

First, this argument relates to recoverable damages that are proximately caused by a breach. As explained above, the scope of this appeal is limited to the issue of duty. Second, the legal proposition on which Elephant relies is that "a person's duty to exercise reasonable care in performing a voluntarily assumed undertaking is limited to that undertaking, and will not normally give rise to an obligation to perform additional acts of assistance in the future." *Fort Bend Cty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 397 (Tex. 1991). This principle is merely "that the defendant's negligence [must occur] in performing the undertaking itself." 1 TEX. PRAC. GUIDE PERS. INJ. 2d § 4:12 (2019). This principle does not limit the recoverable damages; it limits a negligent undertaking duty with regard to performing "acts . . . in the future." *See Sbrusch*, 818 S.W.2d at 397. This principle is inapplicable in this case because Kenyon alleged a negligent undertaking duty arose, not because of Elephant's past conduct, but because Elephant was opening its investigation of her claim and providing post-accident guidance. Third, we explained above why such an analysis would be untenable:

> [I]f a person on the roadside is struck and killed by a car while performing an unreasonably dangerous task required by the insurance company during its investigation, and the insured's death allowed the insurance company to delay payment of the claim, it would make little sense that the insured's estate could recover economic damages resulting from any wrongful delay of the insured's claim caused by the insured's death, but not recover foreseeable damages resulting from the insured's death itself.

*Supra* n.10.

Additionally, Elephant's position is irreconcilable with the supreme court's decisions in negligent undertaking cases. In *American K-9 Detection Services LLC v. Freeman*, the supreme court stated that undertaking to build and repair a dog kennel "would support a negligent-undertaking claim" in which the injury was a dog bite. 556 S.W.3d 246, 258 (Tex. 2018). In

*Torrington*, the negligent undertaking claim was based on a manufacturer's negligent inspection of a helicopter, but the damages arose from the deaths of two Marines. 46 S.W.3d at 836–37. Elephant's position overlooks that a negligent undertaking duty can arise when the defendant's performance increases the risk of harm. *See id.*; *Thomas*, 293 S.W.3d at 322. Elephant's position is also irreconcilable with the Restatement sections under which Texas courts have considered negligent undertaking claims. *See, e.g.*, RESTATEMENT § 323 (providing an illustration where employer would owe negligent undertaking duty for giving sick employee a ride home, if the employee got sicker as a result of a breach of duty); *id.* § 324A (providing similar examples where injury exceeded scope of the intended benefit or protection).

### d. Conclusion as to the "Benefit or Protection" Requirement

The summary judgment evidence shows Elephant performed insurance services—"guid[ing] the insureds through the post-accident events, including beginning [Elephant's] investigation of the claim"—for Kenyon's benefit or protection. *See Torrington*, 46 S.W.3d at 838; *Thomas*, 293 S.W.3d at 318; RESTATEMENT § 323; *see, e.g.*, *Colonial Sav. Ass'n*, 544 S.W.2d at 120. The summary judgment evidence therefore raises a fact issue as to the "benefit or protection" requirement.

## B. Plaintiff's Reliance or Defendant's Performance

A negligent undertaking duty also requires either the plaintiff's reliance on the defendant's undertaking or that the defendant's performance increased the risk of harm. *See Torrington*, 46 S.W.3d at 838; RESTATEMENT § 323; *see also Guillory v. Seaton, LLC*, 470 S.W.3d 237, 241 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). Elephant argues Kenyon admitted she did not rely on Moritz to protect her or Theodore's physical safety at the accident scene. Elephant refers to Kenyon's deposition testimony in which she testified she did not rely on Moritz to protect her

physical safety, and she and Theodore were in a better position than Moritz to determine whether they could safely take pictures.

Even if we take this as true, specifically that Kenyon did not rely on Elephant to protect her physical safety, a negligent undertaking duty may arise when undertaking to perform services for the benefit or protection of a person's "things" or "property." *See Torrington*, 46 S.W.3d at 838; *Colonial Sav. Ass'n*, 544 S.W.2d at 120. Kenyon specifically alleged Elephant "undertook these actions knowing that the insureds were looking to [Elephant] *to protect their interests* and themselves" (emphasis added). As explained above, the evidence raises a genuine issue of material fact as to whether Elephant undertook to perform insurance-related services for the benefit or protection of Kenyon—or her "property" or "things."

Evidence showing an insured followed an insurance company's instructions during the course of an investigation of an insurance claim is sufficient evidence of reliance. *See W. Hills Bowling Ctr.*, 412 F.2d at 564–65. The call transcript shows the car accident was Kenyon's first, and Kenyon relied on Moritz's post-accident guidance as Moritz began processing and investigating Kenyon's claim. The transcript also shows Kenyon relied on Moritz's directions by complying with all of Moritz's requests for information during the call. Kenyon testified in her deposition she followed Moritz's instruction, "Go ahead and take pictures," and asked Theodore to take pictures. The evidence also raises a fact issue as to whether Elephant's investigative request—instructing Kenyon to take pictures—and the manner in which it provided roadside assistance increased the risk of harm.

In this issue, Elephant argues Moritz never "instructed" Kenyon to take pictures. Elephant has characterized the alleged instruction as an acceptance of Kenyon's "offer" to take pictures. The call transcript shows that after Kenyon described the incident Kenyon asked, "Do you want us to take pictures?" Moritz responded, "Yes, ma'am. Go ahead and take pictures." After Kenyon

told Moritz that she had called her husband and "you're my second call," Moritz responded, "Okay. And pictures. And you said you're going to take pictures." Elephant argues, "No reasonable interpretation of [the] exchange regarding photos – which Kenyon initiated – supports construing Moritz's answer as a command, direction, or instruction requiring Kenyon to take photos or that those photos must be taken at the accident scene."

Even if Kenyon were required—for purposes of duty—to produce summary judgment evidence showing Elephant actually instructed her to take pictures at the scene of the accident, we hold Kenyon met this burden. The call transcript shows Moritz said, "Go ahead and take pictures." Grammatically, this statement is not a declaration, question, or exclamation; it is an imperative (i.e. a command, direction, or instruction). *See* MERRIAM-WEBSTER'S DICTIONARY (2019), https://www.merriam-webster.com/dictionary/imperative (defining "imperative" as the "the grammatical mood that expresses the will to influence the behavior of another or a verb form or verbal phrase expressing it" or a "command" or "order"). Moreover, the call transcript is contained in a cold record; an audio recording is not part of the summary judgment record. We are therefore unable to discern tone or emphasis that might further support Kenyon's allegations that the statement, "Go ahead and take pictures," was a command or instruction to be followed at the scene of the accident.

And, throughout the phone call, Moritz encouraged Kenyon to take other actions—such as calling the police—specifically at the scene of the accident. Kenyon produced evidence showing Moritz was trained to encourage insureds to take pictures of the accident scene while "at the scene of the accident." A jury could reasonably believe from this evidence that Elephant intended to have Kenyon take pictures while she was at the scene of the accident and that Kenyon understood the statement as an instruction to do so. We hold Kenyon produced evidence raising a genuine issue of material fact as to whether she relied on Elephant's post-accident guidance, including

instructions given during its investigation of her claim, and whether Elephant's performance increased the risk of harm. *See Torrington*, 46 S.W.3d at 838; *Guillory*, 470 S.W.3d at 241; *see, e.g.*, *W. Hills Bowling Ctr.*, 412 F.2d at 564–65.

**C. Conclusion as to Kenyon's Negligent Undertaking Claim**

As to a negligent undertaking duty, we hold the summary judgment evidence favorable to Kenyon, taken as true and viewed in a light most favorable to her, raises a genuine issue of material fact as to the specific grounds presented in Elephant's summary judgment. The trial court therefore erred by rendering summary judgment on Kenyon's negligent undertaking claim based on Elephant owing no duty to the Kenyons.

### NEGLIGENT TRAINING

Kenyon argues the trial court erred by rendering summary judgment on her negligent training claim. For her negligent training claim, Kenyon argues Elephant owed a duty to train because "[t]he employer-employee relationship . . . may create a duty to a third party, such as Mrs. Kenyon, only if the third party's harm is brought about by reason of the employment and is, in some manner, job-related." Because Kenyon argues the trial court erred by rendering summary judgment on her negligent training claim, and specifically argues a duty to train exists, we review the trial court's summary judgment on this issue de novo. We therefore begin with how Kenyon pled the claim:

> 16. Additionally, or in the alternative, [Elephant's] negligence was the result of [Elephant's] negligent failure to adequately train . . . its FNOL employees. Once [Elephant] undertook to have its FNOL employee guide its insureds through post-accident events when the insureds called in a claim, [Elephant] had a duty to its insureds (including the Plaintiffs) to train its employees handling first party auto-accident claims to instruct its insureds at the scene of an auto accident in a safe and competent manner. [Elephant] had a duty to ensure that its First Notice of Loss (FNOL) employees (i.e. Moritz) were trained . . . if the FNOL employee was tasked to investigate claims on behalf of [Elephant] when the insureds first called in the claim. [Elephant] breached these duties. Given that the insureds (Plaintiffs) would be making these calls from the scene of the accident, it was foreseeable by

[Elephant] that its failure to train . . . would result in injury to insureds. [Elephant's] failure to properly train . . . its employees (First Notice of Loss agents) was a proximate cause of the injuries and damages sued for by the Plaintiffs.[17]

Here, Kenyon alleged: (1) Elephant owed a "duty to its insureds (including the Plaintiffs) to train its employees handling first party auto-accident claims to instruct its insureds at the scene of an auto accident in a safe and competent manner," and (2) the legal basis for the duty is an employer–employee relationship through which Elephant decided to have one of its employees "guide its insureds through post-accident events when the insureds called in a claim."

Elephant makes several arguments on appeal regarding this claim, but our review is limited to the specific duty grounds expressly presented in the summary judgment motion. *See Stiles*, 867 S.W.2d at 26; *Hardaway*, 544 S.W.3d at 412. Elephant's sole ground challenging the duty element of Kenyon's negligent training claim was the following traditional ground:

> The absence of any undertaking negates the duty to train.
> Kenyon bases her negligent training claim on her allegation that Elephant engaged in an actionable undertaking for the protection or benefit of Kenyon and her husband. As demonstrated above, Elephant did not undertake any affirmative course of action for the Kenyons' protection or benefit. Therefore, it could not have owed them any duty to train its employees with regard to this nonexistent undertaking.[18]

---

[17] This paragraph contained some allegations about licensing. However, Moritz's lack of an adjuster's license was the basis of Kenyon's negligent failure to license and negligence per se claims alleged in paragraph 18 and 19. As noted above, we do not address these claims.

[18] Elephant's other grounds did not expressly challenge the duty element of Kenyon's negligent training claim. In a traditional ground, Elephant also argued:

> Moritz did not commit an actionable tort.
>
> ***Again, the only tort Kenyon alleges as a basis for her negligent training claim is negligent undertaking***. Neither Moritz, nor any other Elephant employee, undertook to perform services ***for the protection or benefit of the Kenyons***. Therefore, no employee committed an actionable tort, without which Elephant cannot be held liable for negligent training.

(emphasis added). This ground does not assert Moritz owed no duty, and the trial court ruled Elephant owed no duty. The requirement that an employee commit an actionable tort is separate from the requirement that the employer owe the plaintiff a duty. *See Doege v. Sid Peterson Mem'l Hosp.*, No. 04-04-00570-CV, 2005 WL 1521193, at *7 (Tex. App.—San Antonio June 29, 2005, pet. denied) (mem. op.). In a no-evidence ground, Elephant argued:

> Elephant is entitled to summary judgment because Kenyon can produce no evidence that Elephant's employees ***needed additional training***, nor can she produce evidence of what specific training the employees required. In addition, Kenyon cannot produce any evidence that Elephant's

Although Elephant notes the Supreme Court of Texas has not yet defined the existence or scope of such a claim, Elephant's summary judgment motion does not expressly challenge the existence of such a cause of action under Texas law. Elephant's sole ground for summary judgment on the duty element of Kenyon's negligent training claim was that, because Kenyon's negligent undertaking claim fails, her negligent training claim must also fail.

We hold this specific ground does not establish Elephant's entitlement to summary judgment on Kenyon's negligent training claim. First, as previously explained, Elephant is not entitled to summary judgment on Kenyon's negligent undertaking claim. Furthermore, a negligent training claim need not be based on a negligent undertaking theory as a matter of law, and the facts giving rise to these duties are different. *See, e.g.*, *Douglas v. Hardy*, No. 12-18-00035-CV, 2019 WL 2119670, at *4 (Tex. App.—Tyler May 15, 2019, no pet.) (analyzing negligent training without reference to negligent undertaking, and stating a duty to train may arise when "employees are engaged in occupations that require skill and experience, and that could be hazardous to the safety of others.").

Second, we alternatively hold the summary judgment ground does not "meet [Kenyon's] cause[] of action as pleaded." *See Finlan*, 27 S.W.3d at 231–32. Kenyon expressly alleged her negligent training claim "[a]dditionally, or in the alternative" to her negligent undertaking claim. The scope of the duty alleged in Kenyon's negligent training claim applies more broadly than the duty she alleged in her negligent undertaking claim. Kenyon alleged a duty to train arose not during the phone call with Kenyon, but when Elephant determined to have its FNOL representatives open investigations during calls with its insureds. Thus, the negligent training duty Kenyon alleged

---

failure to train ***proximately caused Theodore's death***, nor can she produce evidence that any Elephant employee committed an actionable tort recognized under the common law.

(emphasis added). Because these issues do not relate to whether Elephant owed a duty, they are beyond the limited scope of this appeal.

would have existed before the phone call in this case, and did not arise during the phone call, as Kenyon alleged in her negligent undertaking claim. Although Kenyon used the word "undertook" in her negligent training allegations, which raises a question as to whether Kenyon might have intended to base her negligent training claim on her negligent undertaking claim, we must liberally construe Kenyon's pleadings in her favor because Elephant did not specially except to Kenyon's pleadings. *See Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982). Because Kenyon expressly pled a distinct duty to train "[a]dditionally, or in the alternative" to a negligent undertaking duty, we hold the trial court erred by rendering summary judgment on the negligent training claim based on this specific ground.

### GROSS NEGLIGENCE

Kenyon argues the trial court erred by rendering summary judgment on her gross negligence claim. Kenyon's gross negligence claim was expressly pled to recover exemplary damages "[f]or all of the claims of negligence outlined above." Consequently, the only plausible basis for summary judgment on Kenyon's gross negligence claim is that the trial court concluded there was no "predicate [negligence] liability for gross negligence" because Elephant owed no duty. *See Allen v. Scott*, No. 07-06-0075-CV, 2008 WL 216075, at *2 (Tex. App.—Amarillo Jan. 25, 2008, pet. denied) (per curiam) (mem. op.). Because Elephant did not establish its entitlement to summary judgment as to all predicate negligence liability for gross negligence, including all three negligence claims discussed above, the summary judgment on Kenyon's gross negligence claim necessarily must be reversed as well. The parties dispute the other elements of gross negligence. But, as explained above, the scope of this appeal is limited to duty.

### RESPONSE TO THE DISSENTS

Having agreed there are no published or reported cases with facts similar to this case, the parties agree the question of duty in this case presents an issue of first impression. Although our

analysis above shows a duty is recognized, we will address whether a duty should be recognized under the facts of this case in response to the dissents. Because questions of duty necessarily implicate public policy concerns, our analysis helps to explain the public policy considerations supporting why the law currently recognizes a duty. *See Pagayon*, 536 S.W.3d at 503–04.

In our analysis, we need not decide whether an auto insurance company owes a universal duty to every insured who calls in for any reason. That is not the question before us. "Texas law requires the court to be more specific, to balance the relevant factors in determining the existence, scope, and elements of legal duties." *See id.* at 506. We will simply decide, based on the narrow facts presented in this case, whether a duty should be recognized. The narrow facts to which we refer are as follows:

> An insured calls her auto insurance company to report an accident and loss. The insurance company, through its representative who answers the call, learns the insured is at the scene of a recent one-car accident caused by inclement weather. The insurance company knows its insureds often call from the scene of a recent car accident, knows dangers are present for such insureds, trains its representatives for such calls, and provides a script with questions or prompts for representatives to use while interacting with such callers. The insurance company also has adjusters who independently take pictures of car damage and who investigate claims. In the course of accepting the insured's accident or loss report, the representative is able to determine the insured's coverage and learns the driver is calling from the scene of a recent one-car accident. The representative begins making investigative requests of the insured to assist the insurance company in further processing the insured's claim, and the insurance policy requires the insured to fully cooperate in the investigation, or risk losing coverage.

We therefore address whether, under these narrow facts, an auto insurance company has a duty of reasonable prudence in the very limited context of deciding whether, and if so how, to instruct an insured to take pictures at the scene of a recent one-car accident.

**A. Duty Considerations**

"[T]he existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question." *Greater Hous. Transp. Co. v. Phillips*, 801 S.W.2d 523,

525 (Tex. 1990). Usually, such facts are undisputed and the duty issue is decided as a matter of law. *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 182 (Tex. 2004). But "in some instances these issues may turn on facts that cannot be determined as a matter of law and must instead be resolved by the factfinder." *Id.* For such factual matters, we will assume Elephant satisfied its initial summary judgment burden, and consider whether Kenyon's evidence raises a genuine issue of material fact.

We first identify the risk of harm and assess whether that risk is foreseeable. *Phillips*, 801 S.W.2d at 525. If the risk is not foreseeable, "there is no duty." *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 954 (Tex. 1996) (per curiam). If the risk is foreseeable, however, we then determine whether the risk is unreasonable by weighing the severity and likelihood of foreseeable injuries against the burden on the defendant. *See Pagayon*, 536 S.W.3d at 504. We also consider other social, economic, and political consequences, and other considerations that weigh for or against recognizing a particular duty. *See id.* For example, if neither party has superior knowledge or recognition of the risk, there may be no particularized duty to warn, control, or protect. *See Graff v. Beard*, 858 S.W.2d 918, 920 (Tex. 1993). In some cases, a contractual right to direct and control another's activities may establish a duty as a matter of law. *See Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002).

### 1. The General Risk of Harm is Reasonably Foreseeable

Foreseeability of the risk of harm is the primary and dominant consideration, but we cannot assess foreseeability of a risk of harm without first identifying that risk. *See Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 36–38 (Tex. 2002). The risk of harm is "the general danger, not the exact sequence of events that produced the harm." *Mellon Mortg. Co. v. Holder*, 5 S.W.3d 654, 655 (Tex. 1999) (quotation marks omitted). Kenyon's claims are based on Theodore getting hit by a car while taking pictures of Kenyon's recent car accident. The general danger presented in the

narrow facts of this case is the risk of a car hitting a pedestrian who is on the roadside taking pictures of the scene of a recent car accident. *See id.*

### a. Foreseeability of Theodore's Injury

Elephant argues that, even if it was foreseeable that Kenyon might get hit by another car while on the side of the road after being in an accident, it was not foreseeable that Theodore might get hit by another car. This argument is unavailing. First, if the general risk of harm—a car hitting a pedestrian who is on the roadside taking pictures of the scene of a recent car accident—is foreseeable, then the risk is present for any person who is or arrives on the scene, not just those involved in the accident. Second, the evidence raises a fact issue as to whether Elephant knew or reasonably should have foreseen that Theodore was present. The call transcript shows Kenyon repeatedly used the words "we" and "us" while on the phone with Moritz. The call transcript clearly indicates that at least twice Kenyon was "(Speaking to someone else)."[19] The call transcript also notes Kenyon told Moritz she had called her husband, and she was grateful he was only a few miles away at home. This evidence raises a fact issue as to whether Elephant knew or reasonably should have foreseen somebody else, such as Theodore, was present. Third, it suffices that the general risk of harm, rather than the exact series of events producing the harm, is foreseeable. *See Mellon Mortg.*, 5 S.W.3d at 655. That Theodore arrived at the scene, Kenyon asked Theodore to take pictures, and Theodore is the pedestrian who was hit by another car while taking pictures on the roadside is "the exact sequence of events that produced the harm," not "the general danger." *See id.* The foreseeability of the exact sequence of events resulting in the injury to Theodore is therefore immaterial to our foreseeability analysis.

---

[19] The call transcript indicates only once that Kenyon stated she was talking to a firefighter, but the call transcript does not conclusively establish the firefighter was the only other person to whom Kenyon was talking.

###### b. The General Risk of Harm is Foreseeable as a Matter of Law

Theodore was struck by a car while he was on the roadside taking pictures of the scene of Kenyon's recent car accident. Kenyon alleged the car's driver was negligent. Elephant argues that, for the negligent conduct of the other driver to be foreseeable, Elephant must have had knowledge of prior similar incidents. We disagree. First, a defendant's awareness of prior similar incidents may be necessary when the harm is caused by third-party conduct, but such proof is not required when the third party's conduct is otherwise foreseeable as a matter of law based on using "common experience and practical sense." *Clark v. Waggoner*, 452 S.W.2d 437, 440 (Tex. 1970); *accord Nabors Well Servs., Ltd. v. Romero*, 456 S.W.3d 553, 565 (Tex. 2015) (relying on common sense rather than evidence of prior similar incidents in concluding traffic hazards are obviously foreseeable).[20] Here, the relevant third-party conduct is another motorist's negligence. "[W]hen it comes to foreseeing the general hazard of automobile travel, [t]here is nothing to anticipate; the negligence of other motorists is omnipresent." *Romero*, 456 S.W.3d at 566 (quotation marks omitted). Thus, using common sense, the supreme court has held other motorists' negligence is foreseeable as a matter of law. *See id.*

Second, in considering foreseeability of car accidents, the supreme court has relied on a National Highway Traffic Safety Administration (NHTSA) report to show the ubiquitous dangers of negligent drivers. *See id.* at 565–66. According to the NHTSA, the danger of drivers hitting distracted pedestrians on the roadside is also ubiquitous:

> The number of pedestrians dying on America's roads appears to be on the rise. While final reporting and analysis of 2018 traffic deaths are still underway, early estimates by NHTSA point to pedestrian deaths increasing 4% over the previous year. On average, a pedestrian died every 88 minutes in 2017 — accounting for 16% of all traffic fatalities.

---

[20] "The 'foreseeability' analysis is the same for both duty and proximate cause." *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010); *see* RESTATEMENT § 290 (stating that to determine duty, an actor should recognize his conduct involves a risk based on "common knowledge").

NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., U.S. DEP'T OF TRANSP., *How Pedestrians Can Walk Safely*, https://www.nhtsa.gov/pedestrian-safety/how-pedestrians-can-walk-safely (last visited Feb. 10, 2020). Pedestrian "[d]eaths increased 35% when comparing 2008 and 2017 fatalities." *Id.*[21] "Distractions can be a factor in pedestrian crashes," such as when pedestrians are "using a cell phone." *See id.*

Third, the Texas Legislature's adoption of and amendments to Texas's Move Over Act—legislation that has been enacted nationwide—also establish the general risk of cars hitting pedestrians on the roadside is foreseeable as a matter of law. In 2003, the Texas Legislature enacted the Move Over Act to "prevent injuries and fatalities during roadside emergencies . . . by mandating that drivers move over or slow to a safe speed." Senate Transp. Comm., Bill Analysis, Tex. S.B. 193, 78th Leg., R.S. (2003), https://capitol.texas.gov/tlodocs/78R/analysis/html/SB00193H.htm.

> [P]ublic servants and their vehicles are at risk each time they . . . must assist at an accident scene or other emergency. Motorists kill or injure several of these public servants each year . . . , despite their efforts to perform their duties safely out of the flow of moving traffic . . . .

House Transp. Comm., Bill Analysis Tex. S.B. 193 78th Leg, R.S. (2003), https://hro.house.texas.gov/pdf/ba78r/sb0193.pdf#navpanes=0. In 2011, the Legislature expanded the Move Over Act to require drivers to move over or slow down when tow truck operators are present on the roadside.

> Tow truck operators are often the first ones at an accident scene and are often the only responders at an incident scene such as a break-down or flat-tire. Towing professionals know too well the dangers of being on the side of the road as traffic drives by. Tragically, an average of one tow operator is killed each week in the United States while providing service to a motorist.

---

[21] The supreme court often relies on data and reports on government agency websites. *See, e.g.*, *Worsdale v. City of Killeen*, 578 S.W.3d 57, 73 & nn.102–04 (Tex. 2019); *In re Thetford*, 574 S.W.3d 362, 364–65 & nn. 3–5 (Tex. 2019).

Senate Transp. Comm., Bill Analysis Tex. H.B. 378, 78th Leg. R.S. (2011), https://capitol. texas.gov/tlodocs/82R/analysis/html/HB00378E.htm. The Legislature expanded the Move Over Act again in 2013 to include highway workers. Senate Transp. Comm., Bill Analysis Tex. S.B. 510, 83rd R.S. (2013), https://capitol.texas.gov/tlodocs/83R/analysis/html/SB00510I.htm. The amendment was supported because "[h]ighway workers are losing their lives as a result of being struck on the job by traveling motorists. Since 1938, 101 Texas Department of Transportation (TxDOT) employee fatalities were a result of being struck by motorists while the employees were working within a work zone or near the shoulder of the roadway." *Id.* Many, if not all, other states in the United States have adopted laws that similarly protect certain pedestrians who are on the roadside at accident scenes from the risk of harm posed by other drivers. *See, e.g.*, ALA. CODE § 32-5A-58.2; ALASKA STAT. § 28.35.185; ARIZ. REV. STAT. § 28-775 E-1-2; ARK. CODE § 27-51-310; CAL. VEH. CODE § 21809; COLO. REV. STAT. § 42-4-705. Based on these considerations, we hold the general risk of a car hitting a pedestrian who is on the roadside taking pictures of a recent car accident is foreseeable as a matter of law.

### c.  The General Risk of Harm is Foreseeable as a Matter of Evidence

Assuming foreseeability must be determined as a matter of evidence, Elephant argues Kenyon failed to produce evidence showing Elephant was aware of a prior incident in which it or another auto insurance company instructed an insured to take pictures at the scene of an accident and the insured's husband was hit by car. Elephant's emphasis on how the general risk of harm manifested in this particular case is misplaced because our focus is "not the exact sequence of events that produced the harm," but "the general danger" itself. *See Mellon Mortg.*, 5 S.W.3d at 655. Moreover, even if foreseeability of the general risk of harm cannot be established as a matter of law, Kenyon responded with evidence sufficient to raise a fact issue as to foreseeability of the

risk. *See Phan Son Van v. Pena*, 990 S.W.2d 751, 754 (Tex. 1999); *Spears v. Coffee*, 153 S.W.3d 103, 106 (Tex. App.—San Antonio 2004, no pet.)

First, Moritz testified in her deposition that "when an insured calls . . . to report a single-vehicle loss like Ms. Kenyon . . . there may be dangerous situations or circumstances for that person at the scene of the accident." The call transcript establishes Moritz was aware Kenyon had been driving in rainy conditions, her car slid and spun, and she had hit a guardrail. Moritz was also aware there were other drivers, such as the firefighter who stopped to ask whether Kenyon needed assistance. This evidence alone shows Moritz knew or reasonably should have known other drivers posed a risk, especially because of the wet road. Second, the call transcript also shows Moritz was aware of a recent, nearby, and nearly identical accident similar to the one resulting in Theodore's death: Kenyon's own accident. Thus, the record does not support Elephant's assertion that there is no evidence of any prior similar incident. Third, deposition testimony from a police officer, Michael Peña, shows that in his experience with "hundreds and hundreds of crashes," at car accident sites, "people walking around taking pictures . . . creates a bigger hazard" because of other drivers on the roads.

Elephant argues this evidence does not show that an auto insurance company should have foreseen the general risk of harm. We disagree with Elephant's suggestion that auto insurance companies cannot reasonably foresee the risks posed by others driving on a wet road near the scene of a recent car accident. Elephant's policy provides coverage for when an insured or her spouse gets "struck by . . . a motor vehicle." The general risk of harm is contemplated by Elephant's auto insurance policy. If foreseeability of the risk cannot be decided as a matter of law, the evidence raises a fact issue as to whether Elephant could have reasonably foreseen Kenyon, and whoever else was with her, was exposed to the risks of other motorists driving in rainy conditions. This

"foremost and dominant consideration" weighs in favor of recognizing a duty of reasonable prudence under the narrow facts of this case. *See Phillips*, 801 S.W.2d at 525.

### 2. The Risk Is Unreasonable

For a duty to exist, the foreseeable risk must also be unreasonable. *See id.* at 526. "Unreasonableness turns on the risk and likelihood of injury to the plaintiff . . . as well as the magnitude and consequences of placing a duty on the defendant." *UDR Tex. Props., L.P. v. Petrie*, 517 S.W.3d 98, 102 (Tex. 2017) (internal quotation marks omitted). Under this test, a court "considers, indeed balances, the burden on the defendant of preventing the harm against the severity and likelihood of the injury the plaintiff faces." *Id.* at 107 (Willett, J., concurring).[22]

### a. Burden on the Defendant & Social Utility

A duty of reasonable prudence under the narrow facts of this case places a burden on an auto insurance company to either: (1) not instruct insureds on the roadside at the scene of a recent one-car accident to take pictures; or (2) in giving such an instruction, clarify pictures need not be taken on the roadside at the accident scene or instructing the insured to first move to a safe location. Kenyon argues this burden is low, and we agree.

Elephant argues that even if it had instructed Kenyon to move to a safe location before taking pictures, nothing would have changed because Kenyon admitted she was in a better position to assess the risk and she believed she and Theodore were in a safe location. In other words, Elephant argues the alleged breached was not a "but for" cause of Kenyon's injury. However, as explained above, the scope of this appeal is limited to the issue of duty.

Elephant contends the imposition of a duty to protect its insureds' physical safety would be "far from negligible" and "tantamount to imposing strict liability on insurers" because the

---

[22] Justice Willett likened this test to Learned Hand's "B < PL" formula that remains part of the Restatement of Torts. *See id.* at 106–07.

insurance company would have to "verify information" provided by insureds at remote locations. Elephant further contends obtaining pictures at the scene of an accident:

> is critical to fulfilling its well-settled duty to investigate claims promptly, thoroughly, and in good faith. The new duty Kenyon advocates is antithetical to that existing good faith duty, because it exposes insurers to liability for an insured's bodily injury and death any time an insured notifies the insurer from the scene of an accident and the insurer asks for any information relevant to the insured's claim. Not only would this new duty frustrate insurers' ability to comply with their good faith obligations, but its imposition would also jeopardize insureds' well-established rights to prompt, thorough, and fair resolution of their claims.

We disagree for several reasons.

First, in stating a duty would require verifying information or impose liability any time an insured calls from the scene of an accident, Elephant's arguments assume a general, overly-broad duty. As previously noted, the factual predicates giving rise to the duty of reasonable prudence we consider are: (1) an insured calls her auto insurance company to report an accident or loss; (2) the auto insurance company hires and trains FNOL representatives who answer such calls and provides them a script of questions or prompts; (3) such an FNOL representative who answers an insured's call learns the insured is at the scene of a recent one-car accident or is trained to determine whether other drivers are involved in the accident; (4) the FNOL representative can determine the insured's coverage; and (5) the auto insurance company has a practice of hiring adjusters to independently document and take pictures of car damage for claims processing. Thus, we need not consider whether a broad general duty exists to inquire into and verify every caller's location or safety. We only consider whether a duty arises when the above-listed factual predicates are met, in the very limited context of deciding whether and how to instruct insureds to take pictures at the scene of a recent one-car accident.

Second, Elephant's arguments about a supposed inability to comply with its duty to promptly investigate and process claims are contrary to the summary judgment evidence. The

evidence shows the utility of pictures of the scene of a one-car accident is questionable because, when the policy's coverage is "comprehensive, you know who's going to pay, you know who's at fault because you're by yourself." The evidence also shows Elephant has adjusters who independently obtain pictures to process claims. To process Kenyon's claim, Elephant used pictures of the damage to Kenyon's car that were later taken at a safer location.

Third, Elephant's arguments about its resultant inability to promptly investigate are conclusory. They do not explain how pictures from the scene of a one-car accident are beneficial in processing insurance claims. The arguments are also speculative because they are not based on any summary judgment evidence or any other part of the record showing pictures from one-car accidents actually assist auto insurance companies with processing and paying insurance claims. Elephant's argument is also wrong as a matter of law. Both the auto insurance policy and state law gave Elephant up to fifteen days from receiving notice of the claim to commence an investigation into an insurance claim. Thus, Elephant was not required to immediately obtain pictures from the accident scene to comply with its duty to promptly investigate Kenyon's insurance claim. *See* TEX. INS. CODE § 542.055(a)(2). Consequently, Elephant's "parade of horribles" resulting from imposing a duty "is largely imaginary." *See Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 557 (2013) (Ginsburg, J., dissenting).

Fourth, Elephant's arguments conflate recognizing a duty with establishing liability. We are not determining "liability" in this appeal; as explained above, our review is limited to the issue of duty, which is merely a threshold inquiry. *See McKinley*, 763 S.W.2d at 409; JOHNSON & GUNN, *supra*, at 231. In such cases, a plaintiff must still prove the other elements of her negligence claim to establish liability. For these reasons, we conclude the burden of imposing a duty under the narrow facts of this case is considerably low.

### b. *Magnitude of Harm*

Generally, a pedestrian who is hit by a car suffers severe bodily injury or death. We know this from "common experience and practical sense," *Clark*, 452 S.W.2d at 440; from the NHTSA, which reports "pedestrians [are] dying on America's roads," NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., *supra*; and from the history of the Move Over Act, which confirms "[m]otorists kill or injure" pedestrians on roadsides. Senate Transp. Comm., Bill Analysis H.B. 378, *supra*. Therefore, the magnitude of harm is significant.

### c. *Probability or Likelihood of Harm*

The likelihood of the general risk of harm is significant. We know this from "common experience and practical sense," *Clark*, 452 S.W.2d at 440; the supreme court's recognition in *Romero* that "the dangers of driving are ubiquitous" regardless of whether the driver is an "urban commuter" or is driving on a "harrowing two-lane highway[,]" 456 S.W.3d at 566; from the NHTSA, which reports pedestrian deaths have increased by 35% over a decade, a pedestrian dies every 88 minutes, and pedestrian deaths accounts for 16% of all traffic fatalities, and these risks increase when a pedestrian is distracted, NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., *supra*; and from the history of the Move Over Act, which echoes and expands upon these statistics, showing the frequency of such dangers causing severe bodily injury or death. This likelihood of such harm has been recognized not only in Texas, but in most if not all other states in the country. *See, e.g.*, ALA. CODE § 32-5A-58.2. The likelihood of the risk of harm is also shown by the deposition testimony of Officer Peña, who testified insurance companies ask insureds to take pictures at the scene of an accident "all the time, . . . [W]e have more issues with people getting out of cars to [take pictures of] crash scenes than anything else[.] I've seen it done in the middle of the highways [and] on these little back roads."

*d.  Conclusion as to Unreasonableness of the Risk*

The significant risk of cars severely injuring or killing insureds on the roadside who are taking pictures of a recent car accident is unreasonable given the low burden on auto insurance companies to either forego unnecessary pictures from the scene of a one-car accident or to use reasonable care in giving an instruction to take such pictures. The unreasonableness of this foreseeable risk weighs in favor of recognizing a duty under the narrow facts of this case. *See Phillips*, 801 S.W.2d at 525.

*3.  Superior Knowledge or Recognition of the General Risk of Harm*

Elephant argues Kenyon admitted she had superior knowledge of the risk. Elephant relies on Kenyon's deposition testimony, in which she stated she was in the better position to determine if she was in a safe place, as compared to Moritz who was at a call center in another state. We hold this consideration does not weigh against recognizing a duty under the narrow facts of this case.

First, courts generally only weigh this factor when considering the existence of a nonfeasance duty, such as a duty to warn, protect, or control; not a misfeasance duty to use reasonable prudence in one's conduct. *See Graff*, 858 S.W.2d at 920. Because we need not consider a duty to warn, protect, or control, this consideration has questionable relevance.

Second, Elephant again misplaces its emphasis on "the exact sequence of events that produced the harm," not on "the general danger" itself. *See Mellon Mortg.*, 5 S.W.3d at 655. A person at the scene of an accident is in a better position to assess the exact sequence of events that might result in another car hitting someone at the scene of the accident. But we must focus on knowledge or appreciation of the general danger itself, not the exact sequence of events. *See id.* Moritz acknowledged the scene of a recent car accident is dangerous for insureds, demonstrating that one's awareness of the general risk of a car hitting a pedestrian on the roadside does not diminish with increasing physical distance from the roadside.

Third, the facts of this case involve a driver who had never been in a car accident before, and an auto insurance company that interacts with insureds at the scene of recent car accidents in the regular course of its business. It is reasonable to infer an auto insurance company would, as compared to an ordinary driver, have superior knowledge or recognition of the risk. *See Romero*, 456 S.W.3d at 565. The testimony Elephant relies on—Kenyon's deposition testimony that she believed she and Theodore were safe—must be viewed in context of the evidence that she was, unfortunately, mistaken. The evidence as a whole, viewed in a light most favorable to Kenyon, raises a genuine issue of material fact as to this consideration.

### 4. *The Negligence of Other Responsible Parties*

Elephant argues pedestrians and other drivers must be responsible for using reasonable prudence, positing that it should be excused from any duty to use reasonable prudence because others might be more at fault. The supreme court rejected this position in *Ryder Integrated Logistics, Inc. v. Fayette County*, 453 S.W.3d 922, 930–31 (Tex. 2015). Elephant has the right to argue, as it did in this case, that the insured and other driver should be held proportionately responsible for their negligence. *See id.* But in 1973, Texas abandoned the "all-or-nothing system" that barred a plaintiff from recovery if she is 1% at fault. *See id.* A plaintiff is barred from recovery only if her contribution to the alleged harm is greater than 50%. *Id.* And "the jury is given wide latitude in determining the negligent parties' proportionate responsibility." *See Jackson v. Williams Bros. Constr. Co.*, 364 S.W.3d 317, 325 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).

Even if a plaintiff and third-party driver would always share some responsibility for such accidents, this does not excuse an auto insurance company from all liability for foreseeably and unreasonably contributing to the severe bodily injury or death of its insureds. Consistent with "the public policy behind the law of negligence which dictates every person is responsible for injuries which are the reasonably foreseeable consequence of his act or omission," recognizing a duty

merely raises the possibility that an auto insurance company might be one of several parties who must share responsibility for death and severe bodily injury arising from a situation to which it foreseeably contributed. *See Escoto*, 288 S.W.3d at 404. The goal of ensuring proportionate responsibility—among all of those who are responsible—weighs in favor of recognizing a duty under the narrow facts of this case. *See Phillips*, 801 S.W.2d at 525.

### 5. *Fraudulent Claims*

Elephant argues pictures of car damage from the scene of one-car accidents "facilitate[s] gathering the best and most contemporaneous evidence." Although Elephant argued pictures help "promptly adjust its insureds' claims," Elephant has never argued any duty imposed would interfere with its ability to detect fraudulent claims. Texas law also deters insurance fraud with criminal penalties. *See* TEX. PENAL CODE §§ 35.01–.04. For each fiscal year from 2016 to 2018, the Texas Department of Insurance reported less than thirty cases of motor vehicle insurance fraud referred for prosecution, including both insurer fraud and claimant fraud. *See* TEX. DEP'T OF INS. FRAUD UNIT 2018 ANNUAL REPORT (Dec. 2018), https://www.tdi.texas.gov/reports/pc/documents/2018fraudreport.pdf. Moreover, the evidence shows Elephant already protects against fraudulent claims by independently obtaining pictures from its adjusters, collecting other information, and having a contractual right to deny coverage if a damaged car is repaired or disposed of before inspection. We cannot say this consideration weighs against recognizing a duty under the narrow facts of this case.

### 6. *The Right of Control as It Relates to the Foreseeability of the Insured Following Instructions and Taking Pictures at the Scene of the Accident*

"A contract may impose control upon a party thereby creating a duty of care." *Bright*, 89 S.W.3d at 606. By its terms and, as a matter of law, Elephant's auto insurance policy "is a contract." *USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 488 (Tex. 2018). Elephant

argues it has no ability to control other drivers on the road. But the contract required Kenyon to "[c]ooperate with [Elephant] in the investigation" or risk losing coverage, thereby imposing a degree of contractual control over Kenyon. The evidence shows Elephant trained its FNOL representatives to instruct insureds to take pictures with the specific objective of having insureds take pictures at the scene of the accident. In *City of Denton v. Page*, the supreme court recognized such control exists when discussing the facts of *Western Hills Bowling Center*; the supreme court stated that by giving an instruction to an insured, the "insurance company . . . ***took control*** of the premises," indicating an insurance company can—even remotely—exert control over premises or an insured. *See* 701 S.W.2d at 835 (emphasis added).

The summary judgment evidence shows Elephant instructed Kenyon, "Go ahead and take pictures," and Elephant routinely instructs insureds who are at the scene of an accident to take pictures, which in turn triggers the insured's further contractual obligation to send those pictures to Elephant. The contractual right to require the insureds to cooperate during an investigation while insureds are on the roadside at the scene of a recent car accident increases the likelihood that insureds will follow an instruction to take pictures, and thereby increase their exposure to the risk of harm posed by other drivers on the road. The auto insurance policy therefore "impose[s] control upon [the insured]." *See Bright*, 89 S.W.3d at 606; *Arnold*, 725 S.W.2d at 167. This right of control weighs in favor of recognizing a duty under the narrow facts of this case. *See Phillips*, 801 S.W.2d at 525.

7. *Special Relationship Considerations*

The insurance policy also gave rise to the parties' special relationship, and the narrow facts of this case strongly implicate most, if not all, of the public policy reasons for recognizing a special relationship. *See Arnold*, 725 S.W.2d at 167. Because the call involved an insured and insurance company, there was unequal bargaining power. *See id.* An insured who calls from the scene of a

recent car accident will often be in a more compromised position than insureds who call from a safer location and when the loss is not so recent. Consequently, "unscrupulous insurers" could more easily take advantage of the misfortunes of an insured who calls from the scene of a recent car accident than others. *See id.* As explained above, the insurance company has the contractual right to make investigation-related demands when an insured calls from the scene of a car accident. *See id.* Furthermore, a duty would disincentivize an "unscrupulous" insurance company from instructing an insured to take unreasonable risks that, if the insured refused, would result in the insured's contractual nonperformance, which the insurance company could then rely on to "deny[] coverage or delay[] payment of a claim." *See id.*

Elephant effectively posits that nothing an auto insurance company's employee could say while on the phone with an insured who is at the scene of a recent car accident could breach a duty of reasonable prudence because such a duty does not exist. As demonstrated by the dissent's analysis of the gross negligence issue, holding Elephant owed Kenyon no duty at all would foreclose the possibility of negligence liability in all similar cases, even under the most extreme facts, because no duty would exist for "similarly situated actors." *See Pagayon*, 536 S.W.3d at 503. The public policy reasons for recognizing a special relationship arising out of an insurance contract weigh in favor of recognizing a duty under the narrow facts of this case. *See Phillips*, 801 S.W.2d at 525.

### 8. The Safety of Police Officers & Other First Responders

Elephant's practice of instructing insureds to take pictures at car accident scenes also threatens the safety of police officers and other first responders. The summary judgment evidence shows Elephant "always recommend[s] that [insureds] call the police." Kenyon also produced the deposition testimony of Officer Peña, who testified instructing insureds to take pictures is not advisable:

> It's not advisable to put yourself in danger, as well as put[ting] the responding officers, whether it be officer, firefighter, EMT, . . . at more of a risk because not only do we have to worry about people involved in the crash, damage to vehicles, open the roadway, people driving, we have to worry about other people walking around taking pictures. It creates a bigger hazard and [is] very bad.

Officer Peña further testified "we have more issues with people getting out of cars to [take pictures of] crash scenes than anything else."

Elephant argues Officer Peña merely testified he "disapproved of insureds taking photos at the scene of the accident," and gave an "unsubstantiated opinion" irrelevant to whether Elephant could have foreseen the accident. We disagree. First, we note this evidence is relevant not only to foreseeability, but also to "other considerations" we must account for in determining whether to recognize a duty; and officer safety is such a consideration. *See Pagayon*, 536 S.W.3d at 504. Second, Officer Peña's testimony is reinforced by the history of the Move Over Act, in which the Legislature recognized that police officers and first responders are at risk of getting hit by other cars at accident sites. Third, Officer Peña's testimony, quoted above, is not an "unsubstantiated opinion" or expert *ipse dixit*. Officer Peña specifically testified his opinion was based on his experience as a police officer with "hundreds and hundreds of crashes," and his personal experiences at those accident sites. His testimony about officer safety concerns is based on reasonable inferences from the role of police officers in securing accident sites while conducting investigations. Taking this evidence as true, insurance companies encouraging insureds take pictures at the scene of car accidents increases risk of severe bodily injury and death to police officers and other first responders. This consideration weighs in favor of recognizing a duty under the narrow facts of this case. *See Phillips*, 801 S.W.2d at 525.

**B. Conclusion as to the Duty Factors**

The general risk of harm in this case is foreseeable and unreasonable given the probability of death or serious bodily injury to insureds and first responders and the relatively low burden on

insurance companies to exercise ordinary care under the narrow facts of this case. Other significant public policy considerations also weigh in favor of recognizing the existing duties that Kenyon alleged.

## CONCLUSION

We accepted this permissive appeal to answer the controlling legal question of whether Elephant established, as a matter of law, it "owed no duty" as to Kenyon's claims of common law negligence, negligent undertaking, negligent training, and gross negligence. For the reasons above, we answer that question in the negative. We reverse the trial court's order as to these claims.[23] We dismiss Kenyon's issues relating to her misrepresentation claim under the Insurance Code and DTPA.

Luz Elena D. Chapa, Justice

---

[23] Because this is an interlocutory appeal, and the case is still pending the trial court, we need not remand this case to the trial court.